**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| INTELLECTUAL TECH LLC,<br><br>      Plaintiff.<br><br>v.<br><br>ZEBRA TECHNOLOGIES<br>CORPORATION,<br><br>      Defendant. | Case No. 6:19-cv-00628-ADA |

**Defendant's Opening Claim Construction Brief**

## Table of Contents

I.  Introduction ................................................................................................................ 1

II.  Background ................................................................................................................ 2

    A.  '247 patent ....................................................................................................... 2

    B.  Original prosecution ......................................................................................... 3

    C.  *Ex parte* reexamination ................................................................................... 4

III.  Legal standard ............................................................................................................ 5

    A.  Claim construction ........................................................................................... 5

    B.  Means-plus-function claims .............................................................................. 6

    C.  Indefiniteness ................................................................................................... 8

IV.  "a processor wherein … the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit" ("the 'processor' phrase") ...................................................................................................... 9

    A.  The "processor" phrase invokes § 112 ¶ 6. .................................................. 10

        1.  The prosecution history establishes that the "processor" phrase invokes § 112 ¶ 6. ...................................................................... 10

            a)  IT admitted that the "processor" phrase invokes § 112 ¶ 6........... 10

            b)  IT acquiesced that the "processor" phrase invokes § 112 ¶ 6. ...... 13

        2.  The claim language and specification confirm that the "processor" phrase invokes § 112 ¶ 6. ........................................................... 14

        3.  IT's "no construction necessary" position fails. ...................................... 15

    B.  As a § 112 ¶ 6 term, the "processor" phrase is indefinite because the specification lacks an algorithm for performing the claimed function. ............... 15

    C.  If the "processor" phrase is not found to be indefinite, the "processor" phrase's construction must reflect the applicant's clear and unambiguous prosecution disclaimer. ....................................................................................... 18

V.      "Bluetooth," "RFID," and "USB" ("the industry standard terms")................................. 22

    A.      "Bluetooth," "RFID," and "USB" should be construed according to their respective specifications. ...................................................................................... 23

    B.      "Bluetooth," "RFID," and "USB" should be limited to Bluetooth, RFID, and USB at the time of the claimed invention. ...................................................... 24

    C.      IT's claim construction approach should be rejected. .......................................... 26

    D.      If the industry standard terms are not temporally limited, then they render the asserted claims indefinite. ................................................................................ 26

VI.     "battery"................................................................................................................... 27

VII.    "microcontroller"...................................................................................................... 28

VIII.   "connection standard"............................................................................................... 29

## Table of Authorities

### Cases

*Abbott Labs. v. Novopharm Ltd.*,
   323 F.3d 1324 (Fed. Cir. 2003) ...............................................................................................11

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008) ......................................................................................... 8, 18

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
   713 F.3d 1090 (Fed. Cir. 2013) ....................................................................................... 14, 17

*Blackboard, Inc. v. Desire2Learn, Inc.*,
   574 F.3d 1371 (Fed. Cir. 2009) ....................................................................................... 16, 17

*Cellular Communications Equipment LLC v. AT&T, Inc.*,
   Case No. 2:15-cv-576-RWS-RSP, 2016 WL 7364266 (E.D. Tex. Dec. 19, 2016) .................. 15

*Chamberlain Grp., Inc. v. Lear Corp.*,
   516 F.3d 1331 (Fed. Cir. 2008) ................................................................................................ 24

*Chrimar Sys., Inc. v. Alcatel-Lucent USA, Inc.*,
   Case No. 6:15-cv-163-JRG-JDL, 2016 WL 1228767 (E.D. Tex. Mar. 28, 2016) ................... 25

*Cole v. Kimberly-Clark Corp.*,
   102 F.3d 524 (Fed. Cir. 1996) ................................................................................................... 7

*Computer Docking Station Corp. v. Dell, Inc.*,
   519 F.3d 1366 (Fed. Cir. 2008) ............................................................................................... 22

*Cypress Lake Software, Inc. v. Samsung Electronics Am., Inc.*,
   382 F. Supp. 3d 586 (E.D. Tex. 2019) ..................................................................................... 15

*Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*,
   412 F.3d 1291 (Fed. Cir. 2005) ................................................................................................. 7

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
   899 F.3d 1291 (Fed. Cir. 2018) ................................................................................................. 6

*Digital Retail Apps, Inc. v. H-E-B, LP*,
   Case No. 6:19-cv-00167-ADA, 2020 WL 376664 (W.D. Tex. Jan. 23, 2020) .......................... 6

*DisplayLink Corp. v. Magic Control Tech. Corp.*,
   615 F. Supp. 2d 1051 (N.D. Cal. 2009) .................................................................................. 24

*Edwards Lifesciences LLC v. Cook Inc.*,
   582 F.3d 1322 (Fed. Cir. 2009) ...............................................................................................11

*ePlus, Inc. v. Lawson Software, Inc.*,
   700 F.3d 509 (Fed. Cir. 2012) ........................................................................ 8

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
   673 F.3d 1361 (Fed. Cir. 2012) ...................................................................... 18

*Extreme Networks, Inc. v. Enterasys Networks, Inc.*,
   2007 WL 5601497 (W.D. Wis. Nov. 21, 2007) .............................................. 25

*Finisar Corp. v. DirecTV Group, Inc.*,
   523 F.3d 1323 (Fed. Cir. 2008) ...................................................................... 18

*Free Stream Media Corp. v. Alphonso Inc.*,
   Case No. 2:15-cv-1725-RWS, 2017 WL 1165578 (E.D. Tex. Mar. 29, 2017) ........................ 15

*Fundamental Innovation Sys. Int'l LLC v. Samsung Elecs. Co.*,
   Case No. 2:17-CV-145-JRG-RSP, 2018 WL 647734 (E.D. Tex. Jan. 31, 2018) ..................... 24

*Gillespie v. Dywidag Systs. Int'l, USA*,
   501 F.3d 1285 (Fed. Cir. 2007) ...................................................................... 22

*GoDaddy.com, LLC v. RPost Communications Ltd.*,
   Case No. cv-14-00126-PHX-JAT, 2016 WL 212676 (D. Ariz. Jan. 19, 2016) ....................... 14

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
   732 F.3d 1376 (Fed. Cir. 2013) ...................................................................... 16

*Masco Corp. v. United States*,
   303 F.3d 1316 (Fed. Cir. 2002) ........................................................................ 6

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*,
   248 F.3d 1303 (Fed. Cir. 2001) ........................................................................ 7

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
   194 F.3d 1250 (Fed. Cir. 1999) ........................................................................ 7

*Myco Industries Inc. v. BlephEx LLC*,
   955 F.3d 1 (Fed. Cir. 2020) ........................................................................... 12

*Nautilus Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014) ............................................................................... 8, 27

*Noah Sys., Inc. v. Intuit Inc.*,
   675 F.3d 1302 (Fed. Cir. 2012) ........................................................................ 8

*Optis Cellular Tech., LLC v. Kyocera Corp.*,
   Case No. 2:16-cv-0059-JRG-RSP, 2017 WL 541298 (E.D. Tex. Feb. 9, 2017) ...................... 15

*Panoptis Patent Mgmt., LLC v. Blackberry Ltd.*,
   Case No. 2:16-cv-62-JRG-RSP, 2019 WL 497571 (E.D. Tex. Feb. 7, 2017) ........................ 15

*PC Connector Sols. LLC v. SmartDisk Corp.*,
   406 F.3d 1359 (Fed. Cir. 2005) ................................................................ 24, 26

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*,
   161 F.3d 696 (Fed. Cir. 1998) ........................................................................ 6

*Personalized Media Communications, LLC v. Apple Inc.*,
   952 F.3d 1336 (Fed. Cir. 2020) ..................................................................... 12

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................................. 5, 24

*Quantum Corp. v. Rodime, PLC*,
   65 F.3d 1577 (Fed. Cir. 1995) ....................................................................... 13

*Realtime Data, LLC v. Rackspace US, Inc.*,
   Case No. 6:16-cv-00961-RWS-JDL, 2017 WL 2590195 (E.D. Tex. June 14, 2017) ............... 15

*Rheox, Inc. v. Entact, Inc.*,
   276 F.3d 1319 (Fed. Cir. 2002) ..................................................................... 21

*SandBox Logistics LLC v. Proppant Express Investments LLC*,
   Case No. 2019-1684, 2020 WL 2517113 (Fed. Cir. May 18, 2020) ........................... 13, 14, 17

*Seachange Int'l, Inc. v. C-COR, Inc.*,
   413 F.3d 1361 (Fed. Cir. 2005) ..................................................................... 22

*Senju Pharm. Co., Ltd. v. Apotex Inc.*,
   746 F.3d 1344 (Fed. Cir. 2104) ..................................................................... 13

*SEVEN Networks, LLC v. Apple Inc.*,
   Case No. 2:19-cv-115-JRG, 2020 WL 1536152 (E.D. Tex. Mar. 31, 2020) ..................... 15

*Shire Dev., LLC v. Watson Pharm., Inc.*,
   787 F.3d 1359 (Fed. Cir. 2015) ................................................................ 5, 10, 12

*SkinMedica, Inc. v. Histogen Inc.*,
   727 F.3d 1187 (Fed. Cir. 2013) ......................................................................11

*Southwall Techs., Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) ....................................................................... 21

*St. Isidore Research, LLC v. Comerica Inc.*,
   Case No. 2:15-cv-1390-JRG-RSP, 2016 WL 4988246 (E.D. Tex. Sept. 19, 2016) ............... 14

*Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc.*,
   731 F.3d 1271 (Fed. Cir. 2013) .................................................................... 5, 10

*Syncpoint Imaging, LLC v. Nintendo of Am., Inc.*,
   Case No. 2:15-cv-00247-JRG-RSP, 2016 WL 55118 (E.D. Tex. Jan. 5, 2016) ................. 15

*Technology Properties Limited LLC v. Huawei Technologies Co., Ltd.*,
    849 F.3d 1349 (Fed. Cir. 2017) ......................................................................................... 22

*TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*,
    920 F.3d 777 (Fed. Cir. 2019) ............................................................................................ 6

*Tempo Lighting, Inc. v. Tivoli, LLC*,
    742 F.3d 973 (Fed. Cir. 2014) ................................................................................. 6, 10, 12

*Tor-Pharm, Inc. v. Ranbaxy Pharm., Inc.*,
    336 F.3d 1322 (Fed. Cir. 2003) ............................................................................ 13, 14, 17

*Uniloc USA, Inc. v. Samsung Electronics America, Inc.*,
    809 Fed. App'x 863 (Fed. Cir. 2020) ............................................................................... 15

*Velocity Patent LLC v. Mercedes-Benz USA, LLC*,
    Case No. 13-cv-8413, 2016 WL 5234110 (N.D. Ill. Sept. 21, 2016) ...................................... 14

*Versata Software, Inc. v. Zoho Corp.*,
    213 F. Supp. 3d 829 (W.D. Tex. 2016) ............................................................................. 27

*Virginia Innovation Sciences, Inc. v. Amazon.com, Inc.*,
    Case No. 4:18-cv-474, 2019 WL 4259020 (E.D. Tex. Sept. 9, 2019) .................................... 15

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ............................................................................................ 5

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) (en banc) ................................................................... passim

*WMS Gaming Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999) .......................................................................................... 8

*Zeroclick, LLC v. Apple Inc.*,
    891 F.3d 1003 (Fed. Cir. 2018) .......................................................................................... 6

**Statutes**

35 U.S.C. § 112 ¶ 2 ............................................................................................................... 8

35 U.S.C. § 112 ¶ 6 ........................................................................................................... 1, 6

35 U.S.C. § 305 .................................................................................................................. 13

**Table of Exhibits**

| Exhibit No. | Description |
| --- | --- |
| 1 | U.S. Patent No. 7,233,247 B1 <br> ("'247 patent") |
| 2 | U.S. Patent *Ex Parte* Reexamination Certificate No. 7,233,247 C1 <br> ("Reexamination certificate") |
| 3 | September 21, 2006 Office Action filed in connection with the prosecution of U.S. Patent Application No. 11/039,221 <br> ("9/21/2006 office action") |
| 4 | January 16, 2007 Office Action filed in connection with the prosecution of U.S. Patent Application No. 11/039,221 <br> ("1/16/2007 office action") |
| 5 | October 19, 2006 Amendment filed in connection with the prosecution of U.S. Patent Application No. 11/039,221 <br> ("10/19/2006 amendment") |
| 6 | February 9, 2007 Amendment filed in connection with the prosecution of U.S. Patent Application No. 11/039,221 <br> ("2/9/2007 amendment") |
| 7 | April 25, 2007 Notice of Allowance filed in connection with the prosecution of U.S. Patent Application No. 11/039,221 <br> ("4/25/2007 notice of allowance") |
| 8 | September 1, 2017 Request for *Ex Parte* Reexamination of U.S. Patent No. 7,233,247 filed in connection with the reexamination of Application No. 90/014,010 <br> ("9/1/2017 reexamination request") |
| 9 | October 10, 2017 Decision on Request for *Ex Parte* Reexamination of U.S. Patent No. 7,233,247 filed in connection with the reexamination of Application No. 90/014,010 <br> ("10/10/2017 reexamination decision") |
| 10 | January 29, 2018 Office Action filed in connection with the reexamination of Application No. 90/014,010 <br> ("1/29/2018 office action") |

| 11 | June 29, 2018 Office Action filed in connection with the reexamination of Application No. 90/014,010 ("6/29/2018 office action") |
|----|---|
| 12 | August 29, 2018 Amendment filed in connection with the reexamination of Application No. 90/014,010 ("8/29/2018 amendment") |
| 13 | February 5, 2019 Amendment filed in connection with the reexamination of Application No. 90/014,010 ("2/5/2019 amendment") |
| 14 | Declaration of Dr. Jacob Sharony ("Sharony decl.") |
| 15 | U.S. Patent Application Publication No. US2006/0174130 A1 ("*Noble*") |
| 16 | Document Library Listing USB Specifications, IT022801-08 ("Listing of USB specifications") |
| 17 | Excerpt from Bluetooth Core Specification, Revision: v5.2, Revision Date: 2019-12-31, IT018954-22209 ("Excerpt of Bluetooth core specification version 5.2") |

## I.      Introduction

In this case, Plaintiff, Intellectual Tech LLC ("IT"), asserts a single patent, U.S. Patent 7,233,247 ("the '247 patent"), against Defendant, Zebra Technologies Corporation ("Zebra").

The '247 patent originally issued with 15 claims. To obtain these claims over the examiner's prior art rejections, the applicant amended every independent claim, made an unmistakable disclaimer, and admitted that one particular claim term, the "processor" phrase (defined in Section II), is a computer-implemented means-plus-function term that invokes pre-AIA 35 U.S.C. § 112 ¶ 6.

A decade after the '247 patent issued, IT initiated a reexamination of its own patent and admitted all 15 original claims are invalid. IT cancelled the 15 original claims and added in their place 145 new claims. Critically, IT included the same "processor" phrase in the new claims in order to gain allowance. IT once again admitted the "processor" phrase constitutes "means-plus-function" language.

The '247 patent's prosecution history is decisive—it establishes that the "processor" phrase is a computer-implemented means-plus-function term. Under well-established Federal Circuit precedent, this term renders every asserted claim indefinite because the '247 patent's specification fails to disclose an algorithm for performing the corresponding claimed function. Even if the Court does not find the "processor" phrase to be indefinite, any claim construction adopted for that term must still reflect the clear prosecution disclaimer made by the applicant to overcome the examiner's prior art rejections.

The Court should adopt Zebra's proposed constructions of the "processor" phrase and the other disputed terms.

## II.      Background

### A.      '247 patent

The '247 patent is titled "Method and system for employing RFID tags in automated applications." Ex. 1 ('247 patent) at 1. FIG. 3, below, shows the patent's sole embodiment.



*FIG. 3*

The disclosed RFID system 300 includes RFID base unit 304, RFID tag 302, computer network 314, and various devices 330, 334, 338. *Id.* at 4:13-17. In base unit 304, RF circuitry 308 communicates information to and from RFID tag 302. *Id.* at 4:30-32. RFID base unit 304 can control "the operation of other external devices" (*id.* at 5:37-38), although the patent specification does not explain how this is accomplished. In particular, the specification does not disclose any algorithm by which the base unit would control any external device.

Microcontroller 310 is especially relevant to Zebra's arguments, as discussed in Section IV, *infra*.

The '247 patent has 163 claims. Ex. 2 (Reexamination certificate). Claims 1-15 issued from the '247 patent's original prosecution but were canceled during reexamination after IT admitted those claims are unpatentable. *Id.* The remaining 148 claims issued from the reexamination proceeding. *Id.* In this case, IT accuses Zebra of infringing 65 claims—in particular, claims 48-61, 63, 65-79, 81-90, 117-120, 129-144, 146, 147, 149-152, and 154-159 ("the asserted claims"). As an example, claim 48 appears below with annotations:

2

48. An apparatus comprising:
a RFID base unit incorporating ***a processor wherein*** the RFID base
    unit is at least configured to employ two or more connection
    standards of a plurality of connection standards and ***the***
    ***processor is configured for outputting at least one signal***
    ***adapted to engage or disengage at least one device through at***
    ***least one connection standard when in communication with an***
    ***RFID circuit***, the RFID base unit further comprising:
    an antenna and RF circuitry;
    an operating system;
    an internal memory comprising dynamic random-access
        memory (DRAM); and
    a rechargeable battery capable of being charged; and
a battery;
wherein the RFID base unit is configured to transmit a notification
    through Voice Over Internet Protocol (VOIP); and
wherein the RFID base unit is configured to communicate with an
    external device using Bluetooth, wireless, or high-frequency
    RFID.

*Id.* at cl. 48.[1] The emphasized phrase is "the 'processor' phrase." The "processor" phrase appears

in every asserted claim and is central to the parties' claim construction disputes.

### B.    Original prosecution

In 2005, the applicant[2] of the '247 patent filed the U.S. patent application that ultimately

issued as the '247 patent. Ex. 1 ('247 patent) at 1. During prosecution, the examiner issued two

office actions rejecting all of the pending patent claims. *See* Ex. 3 (9/21/2006 office action); Ex.

4 (1/16/2007 Office Action). In both office actions, the examiner relied primarily on prior art

U.S. Patent Application Publication No. 2006/0174130 ("*Noble*"). *Id.* To overcome the prior art

rejections, the applicant responded with several claim amendments and arguments, including the

clear and unmistakable disclaimer discussed fully in Section IV.C below. *See* Ex. 5 (10/19/2006

---

[1] All emphases have been added unless otherwise noted.

[2] In this brief, "applicant" refers to Metro Automation, Inc., which, according to the U.S. Patent &
Trademark Office's public assignment records, was the '247 patent's assignee of record in 2005.

amendment); Ex. 6 (2/9/2007 Amendment). In 2007, the U.S. Patent and Trademark Office issued the '247 patent with 15 claims. *See* Ex. 7 (4/25/2007 notice of allowance).

The applicant's prosecution arguments and amendments bear on claim construction in two ways. First, they require a finding that the "processor" phrase (bolded in the prior section) is indefinite means-plus-function language. *See* Sections IV.A-B, *infra*. Second, they require a construction that reflects the applicant's clear and unmistakable prosecution disclaimer. *See* Section IV.C, *infra*.

### C.    *Ex parte* reexamination

In 2017, a decade after the '247 patent issued, IT filed a request for *ex parte* reexamination of its own patent. *See* Ex. 8 (9/1/2017 reexamination request). In its reexamination request, IT admitted that every original claim of the '247 patent is invalid over U.S. Patent No. 6,353,406 ("*Lanzl*"). *Id.* at 2 ("Claims 1-15 are invalid as anticipated based on *Lanzl*."). IT cancelled those claims and proposed 148 new claims. *Id.*

The Patent Office ordered a reexamination, cancelling claims 1-15 and rejecting all the proposed new claims. *See* Ex. 9 (10/10/2017 decision on *ex parte* reexamination request). The examiner issued numerous rejections under 35 U.S.C. § 102 (anticipation), § 103 (obviousness), § 112 ¶ 1 (lack of written description), § 112 ¶ 2 (indefiniteness), and § 305 (impermissible claim broadening). *See* Ex. 10 (1/29/2018 office action); Ex. 11 (6/29/2018 office action). To overcome the prior art rejections, the applicant responded with arguments and claim amendments. *See* Ex. 12 (8/29/18 amendment); Ex. 13 (2/5/19 amendment). To overcome the claim broadening rejection, the applicant ***included all requirements of original patent claim 9*** in the asserted claims and expressly represented that the asserted claims are no broader than original patent claim 9. *See* Ex. 12 (8/29/18 amendment) at 53-55. As a result, the amendments and prosecution disclaimers that the applicant made to narrow original claim 9 during the original prosecution

apply equally to all of the asserted claims. In 2019, the examiner issued a reexamination certificate including new claims 16-163. *See* Ex. 2 (Reexamination certificate).

The applicant's reexamination arguments and amendments bear on claim construction in two ways. First, they show that IT both admitted and acquiesced that the "processor" phrase (bolded above) is indefinite means-plus-function language. *See* Section IV.A.1, *infra*. Second, as noted above, they establish that the asserted claims cannot be broader than original claim 9.

## III.    Legal standard

### A.    Claim construction

"When construing claim terms," the Court must "first look to, and primarily rely on, the intrinsic evidence, including the claims themselves, the specification, and the prosecution history of the patent, which is usually dispositive." *Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc.*, 731 F.3d 1271, 1276 (Fed. Cir. 2013) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Courts consider these various sources of meaning "[b]ecause the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically." *Phillips*, 415 F.3d at 1314.

The prosecution history, in particular, "may be critical in interpreting disputed claim terms because it 'contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims.'" *Sunovion*, 731 F.3d at 1276 (quoting *Vitronics*, 90 F.3d at 1582). Accordingly, even where "prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction." *Shire Dev., LLC v. Watson Pharm., Inc.*, 787 F.3d 1359, 1366 (Fed. Cir. 2015). For example, an applicant's repeated and consistent remarks during prosecution can define a claim term by demonstrating how the inventor understood the

5

invention. *Sunovion*, 731 F.3d at 1277. Similarly, an applicant's amendment accompanied by explanatory remarks can define a claim term by demonstrating what the applicant meant by the amendment. *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977-78 (Fed. Cir. 2014).

### B.       Means-plus-function claims

"A patent claim may be expressed using functional language." *Digital Retail Apps, Inc. v. H-E-B, LP*, Case No. 6:19-cv-00167-ADA, 2020 WL 376664, at *2 (W.D. Tex. Jan. 23, 2020) (citing 35 U.S.C. § 112 ¶ 6; *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347-49 (Fed. Cir. 2015) (en banc)). 35 U.S.C. 112 ¶ 6 provides that a structure may be claimed as a "means ... for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002). "While there is a rebuttable presumption [§ 112 ¶ 6] applies when the claim language includes 'means' or 'step for' terms, and that it does not apply in the absence of those terms, the presumption stands or falls according to whether one of ordinary skill in the art would understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure or acts for performing the function." *Digital Retail Apps*, 2020 WL 376664, at *2 (citing *Williamson*, 792 F.3d at 1349).

"[A] party advocating that a claim limitation that does not recite the word 'means' is subject to § 112, para. 6 can overcome the presumption against its application solely by reference to evidence intrinsic to the patent," *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1299 (Fed. Cir. 2018), *i.e.*, "the claims, the specification, and the prosecution history." *TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 787 (Fed. Cir. 2019). "That determination must be made under the traditional claim construction principles." *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018); *see also Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 702-04 (Fed. Cir. 1998) ("Whether certain claim language invokes 35 U.S.C. § 112, ¶ 6 is an exercise in claim construction" and that the presumption that § 112, ¶ 6

does not apply "can be rebutted if the evidence intrinsic to the patent and any relevant extrinsic evidence so warrant."); *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996) (Whether § 112 ¶ 6 is invoked involves analyzing the "patent and its prosecution history" to understand if skilled artisans would understand the term to connote structure.).

Paragraph 6 of Section 112 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347. Construing a means-plus-function limitation involves multiple steps. "The first step ... is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[T]he next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). However, § 112 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

For those § 112 ¶ 6 limitations implemented by a programmed general-purpose computer or microprocessor, the corresponding structure described in the patent specification ***must*** include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339,

1349 (Fed. Cir. 1999). The corresponding structure is not a general-purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

## C.     Indefiniteness

"[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112 ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112 ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application was filed. *Id.* at 911.

In the context of a claim governed by 35 U.S.C. § 112 ¶ 6,[3] the claim is indefinite if the claim fails to disclose adequate corresponding structure to perform the claimed functions. *Williamson*, 792 F.3d at 1351-52. The disclosure is inadequate when one of ordinary skill in the art "would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim." *Id.* at 1352. Computer-implemented means-plus-function claims are indefinite unless the specification discloses an algorithm to perform the function associated with the limitation. *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1319 (Fed. Cir. 2012).

---

[3] The America Invents Act ("AIA") renamed 35 U.S.C. § 112 ¶ 2 and 35 U.S.C. § 112 ¶ 6 to § 112(b) and § 112(f), respectively. The pre-AIA labels apply here because the patent's effective filing date is January 20, 2005.

IV.    **"a processor wherein … the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit" ("the 'processor' phrase")**

Every asserted claim requires the "processor" phrase.

| Zebra's position | IT's position |
|---|---|
| This term invokes pre-AIA 35 U.S.C. § 112 ¶ 6 and renders each asserted claim invalid under § 112 ¶ 2.<br><br>• Function: "outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit"[4]<br><br>• Structure: The specification lacks adequate structure for performing the claimed function, and therefore, the asserted claims are invalid under § 112 ¶ 2.<br><br>Alternatively, should the Court find that this claim term does not render the asserted claims indefinite, this claim term should be construed as follows: "a processor wherein … the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit and without using an external computation device to control the at least one device." | No construction necessary and/or plain and ordinary meaning. |

These proposals require the Court to resolve two questions: (1) does the "processor" phrase invoke § 112 ¶ 6 and render every asserted claim indefinite; and (2) if that phrase is not found indefinite, does the "processor" phrase's construction include a clear and unmistakable prosecution disclaimer? The intrinsic evidence answers both questions "yes." As discussed

---

[4] As further discussed below, the applicant expressly limited the "processor" phrase during prosecution to require that the claimed structure perform the recited function "without using an external computation device to control the at least one device." *See* Section IV.C.

below, the "processor" phrase is a means-plus-function term that renders the claim indefinite. *See* Sections IV.A-B, *infra*. If the Court does not find the term indefinite, the "processor" phrase's construction must include the applicant's prosecution disclaimer. *See* Section IV.C.

## A.     The "processor" phrase invokes § 112 ¶ 6.

Although the asserted claims do not expressly use the word "means," the intrinsic evidence mandates that the claims invoke 35 U.S.C. § 112 ¶ 6. The presumption that § 112 ¶ 6 does not apply because "means" is not expressly used is easily rebutted here. The '247 patent's intrinsic record conclusively establishes that the "processor" phase invokes § 112 ¶ 6 and thus requires construction under § 112 ¶ 6. *See* Sections IV.A.1-2, *infra*. IT's contrary position that the "processor" phrase requires no construction therefore fails. *See* Section IV.A.3.

### 1.     The prosecution history establishes that the "processor" phrase invokes § 112 ¶ 6.

The '247 patent's prosecution history is "critical in interpreting" the "processor" phrase because it contains IT's "express representations" about that phrase's meaning. *See Sunovion*, 731 F.3d at 1276; *Shire Dev.*, 787 F.3d at 1366; *Tempo Lighting*, 742 F.3d at 977-78. Indeed, during prosecution, IT both admitted and acquiesced that § 112 ¶ 6 governs this term.

#### a)     IT admitted that the "processor" phrase invokes § 112 ¶ 6.

During the '247 patent's original prosecution, the examiner rejected all of the then-pending claims based on the *Noble* prior art reference. *See* Ex. 4 (1/16/2007 office action). To overcome those rejections, IT amended the then-pending independent claims (adding "processor means" to prosecution claims 1, 23, and 39 and "processor" to prosecution claim 31) and presented the following remarks:

> In an attempt to overcome the above rejection, *the terminology "processor means" (ie microcontroller 310) of claim 41 has been added to each of the independent claims 1, 23, 31 and 39* whereby the RFID base unit is more positively defined as being effectively a "smart" or "intelligent" reader of RFID tags.

Ex. 6 (2/9/2007 amendment) at 3-6. Thus, IT expressly admitted that "the terminology 'processor means' … of claim 41 has been added to *each of the independent claims 1, 23, 31 and 39*." And with the term "ie," IT expressly linked the "processor means" to the microcontroller 310 element in the '247 patent's specification. *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1200 (Fed. Cir. 2013) (quoting *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009)); *see also Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1330 (Fed. Cir. 2003) (The patentee "explicitly defined" a term with "i.e." followed by an explanatory phrase.).

IT did not stop there. Along with its claim amendments, IT repeatedly equated "processor" with "microcontroller 310" during the patent's original prosecution. *Id.* at 8 ("By the use of *processor (microcontroller) 310*…"), *id.* ("to be controller through the use of a *processor (microcontroller) 310)*"), *id.* ("The use of *the processor or microcontroller 310 in the present invention*…"). Thus, as with "processor means," IT expressly linked the claim term "processor" to the microcontroller 310 element in the '247 patent's specification.

The prosecution history confirms that it was IT's definitional remarks that persuaded the examiner to issue the patent. In the notice of allowance, the examiner elucidated his determination that "[e]ach independent claim identifies the uniquely distinct features including the <u>processor means</u>" and that "[t]his patentable distinction is included in all independent claims 1, 23, 31, and 39." Ex. 7 (4/25/2007 notice of allowance) at 2 (emphasis in original). Rather than dispute the examiner's remarks, IT *repeated* them in its *ex parte* reexamination request. Ex. 8 (9/1/2017 *ex parte* reexamination request) at 5. IT's reexamination request also repeated IT's

earlier assertion that "the terminology 'processor means' (ie microcontroller 310) of claim 41 has been added to ***each of the independent claims 1, 23, 31 and 39***." *Id.* at 4.

IT's repeated remarks conclusively establish that the "processor" phrase invokes § 112 ¶ 6.[5] IT effectively defined the "processor" phrase "by demonstrating how [IT] understood the invention" and "what [IT] meant by the amendment." *Personalized Media Communications, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) (citing *Tempo Lighting*, 742 F.3d at 977-78). Thus, when skilled artisans read the "processor" phrase in the context of the '247 patent's prosecution history, as they must, they would conclude that the word "processor" is "tantamount to using the word 'means.'" *See Williamson*, 792 F.3d at 1350. As such, the "processor" phrase must be construed under § 112 ¶ 6.

To be sure, this conclusion applies to ***all*** claims that include the "processor" phrase—not just the originally issued claims, but also the current asserted claims. During the reexamination, IT cancelled all of the originally issued claims and added in their place the asserted claims. The examiner rejected the new claims (including all of the asserted claims) for impermissible claim broadening rejection under 35 U.S.C. § 305. Ex. 11 (6/29/2018 office action) at 23. To overcome that rejection, IT narrowed all the asserted claims—by amending them to include limitations of originally-issued claim 9, including the "processor" phrase. IT represented that these amended claims are no broader than original claim 9. Ex. 12 (8/29/2018 amendment) at 53-55.

Thus, the "processor" phrase in the asserted claims cannot be broader than the "processor" phrase in original claim 9. Any conclusion to the contrary would render the asserted

---

[5] The Federal Circuit has held that an applicant's remarks do not have to rise to the level of unmistakable disclaimer to inform claim construction. *See Personalized Media Communications*, 952 F.3d at 1340 ("[E]ven where 'prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction.'" (quoting *Shire Dev., LLC v. Watson Pharm., Inc.*, 787 F.3d 1359, 1366 (Fed. Cir. 2015))); *Myco Industries Inc. v. BlephEx LLC*, 955 F.3d 1, 14 n.8 (Fed. Cir. 2020).

claims invalid under 35 U.S.C. § 305. *See Senju Pharm. Co., Ltd. v. Apotex Inc.*, 746 F.3d 1344, 1352 (Fed. Cir. 2104) (The Federal Circuit has "strictly interpreted § 305 to prohibit any broadening amendments," such that a "reexamined claim cannot be broader in any respect, even if it is narrowed in other respects."); *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1580 (Fed. Cir. 1995) ("An amended or new claim has been enlarged if it includes within its scope any subject matter that would not have infringed the original patent.").

> **b)    IT acquiesced that the "processor" phrase invokes § 112 ¶ 6.**

In addition to its explicit admissions during prosecution, IT acquiesced to the examiner's finding that the "processor" phrase invokes § 112 ¶ 6. "In ascertaining the scope of an issued patent, the public is entitled to equate [IT's] acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest. Such acquiescence may be found where [IT] narrows [its] claims by amendment or lets stand an examiner's restrictive interpretation of a claim." *Tor-Pharm, Inc. v. Ranbaxy Pharm., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003); *see SandBox Logistics LLC v. Proppant Express Investments LLC*, Case No. 2019-1684, 2020 WL 2517113, at *4 (Fed. Cir. May 18, 2020). That is exactly what happened here.

During the '247 patent's reexamination, the examiner found the word "processor" in claims 173, 176, and 183 to invoke § 112 ¶ 6, further found that the patent specification fails to disclose corresponding structure for the claimed function, and therefore rejected all three claims for indefiniteness:

> Claims 173, 176, 183 are further rejected in that ***the claim limitation 'processor' invokes 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph***. However, the written description fails to disclose the corresponding structure, material, or acts for performing the entire claimed function and to clearly link the structure, material, or acts to the function. Therefore, the claim is indefinite and is rejected under 35 U.S.C. 112(b) or pre-AIA 35 U.S.C. 112, second paragraph.

13

Ex. 11 (6/29/2018 office action) at 22. The examiner also construed the word "processor" as used in the pending claims to be a "generic placeholder" that invokes § 112 ¶ 6, in a section entitled "Claim Interpretation." *Id.* at 57-58. IT did not contest the examiner's indefiniteness rejection or claim interpretation. Instead, IT simply cancelled all three rejected claims. Ex. 12 (8/29/2018 amendment) at 53. "[IT's] failure to challenge the Examiner's understanding amounts to a disclaimer." *SandBox Logistics*, 2020 WL 2517113, at *4; *see Tor-Pharm*, 336 F.3d at 1330; *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1096 (Fed. Cir. 2013). When skilled artisans read the "processor" phrase in context of this prosecution history disclaimer, as they must, they would conclude that "processor" is "tantamount to using the word 'means.'" *See Williamson*, 792 F.3d at 1350.

### 2. The claim language and specification confirm that the "processor" phrase invokes § 112 ¶ 6.

Although the '247 patent's prosecution history is decisive, the plain claim language and specification further support that § 112 ¶ 6 governs the "processor" phrase. The claims define the "processor" phrase only by its function, i.e., "outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit." The specification sets forth no additional structure.

Under these circumstances, other courts have found "processor" and similar terms invoke § 112 ¶ 6—even in the ***absence*** of the prosecution admissions IT made here. *See, e.g.*, *St. Isidore Research, LLC v. Comerica Inc.*, Case No. 2:15-cv-1390-JRG-RSP, 2016 WL 4988246, at *15-16 (E.D. Tex. Sept. 19, 2016); ("processor configured to" invokes § 112 ¶ 6); *GoDaddy.com, LLC v. RPost Communications Ltd.*, Case No. cv-14-00126-PHX-JAT, 2016 WL 212676, at *2 (D. Ariz. Jan. 19, 2016) ("processor" invokes § 112 ¶ 6); *Velocity Patent LLC v. Mercedes-Benz USA, LLC*, Case No. 13-cv-8413, 2016 WL 5234110, at *6 (N.D. Ill. Sept. 21, 2016) ("processor

subsystem" invokes § 112 ¶ 6). Similarly, here, the claim language and specification provide support for invoking § 112 ¶ 6, but the intrinsic record here goes even further—the prosecution history compels the conclusion that § 112 ¶ 6 governs the "processor" phrase.

### 3. IT's "no construction necessary" position fails.

IT effectively asks the Court to avoid construing the "processor" phrase in spite of the intrinsic record's clear mandate that this claim term requires construction under § 112 ¶ 6. The Court should reject IT's position and construe the "processor" phrase under § 112 ¶ 6.

Zebra is unaware of any court decision that construed any "processor" phrase under circumstances in which an applicant: (1) admitted during prosecution that a claim term invokes § 112 ¶ 6; or (2) acquiesced by amendment to such a determination by an examiner.[6] Here, IT did both—leaving no doubt that § 112 ¶ 6 governs the "processor" phrase.

### B. As a § 112 ¶ 6 term, the "processor" phrase is indefinite because the specification lacks an algorithm for performing the claimed function.

Because the "processor" phrase invokes § 112 ¶ 6, "the patent specification must disclose with sufficient particularity the structure for performing the claimed function and clearly link that structure to the function." *See Uniloc USA, Inc. v. Samsung Electronics America, Inc.*, 809 Fed. App'x 863 (Fed. Cir. 2020) (citing *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d

---

[6] Zebra expects that IT will improperly anchor its argument in a smattering of inapposite cases in which a court found that the word "processor" does not invoke a construction under 35 U.S.C. § 112 ¶ 6. *See e.g., SEVEN Networks, LLC v. Apple Inc.*, Case No. 2:19-cv-115-JRG, 2020 WL 1536152 (E.D. Tex. Mar. 31, 2020); *Virginia Innovation Sciences, Inc. v. Amazon.com, Inc.*, Case No. 4:18-cv-474, 2019 WL 4259020 (E.D. Tex. Sept. 9, 2019); *Cypress Lake Software, Inc. v. Samsung Electronics Am., Inc.*, 382 F. Supp. 3d 586 (E.D. Tex. 2019); *Realtime Data, LLC v. Rackspace US, Inc.*, Case No. 6:16-cv-00961-RWS-JDL, 2017 WL 2590195 (E.D. Tex. June 14, 2017); *Free Stream Media Corp. v. Alphonso Inc.*, Case No. 2:15-cv-1725-RWS, 2017 WL 1165578 (E.D. Tex. Mar. 29, 2017); *Optis Cellular Tech., LLC v. Kyocera Corp.*, Case No. 2:16-cv-0059-JRG-RSP, 2017 WL 541298 (E.D. Tex. Feb. 9, 2017); *Panoptis Patent Mgmt., LLC v. Blackberry Ltd.*, Case No. 2:16-cv-62-JRG-RSP, 2019 WL 497571 (E.D. Tex. Feb. 7, 2017); *Cellular Communications Equipment LLC v. AT&T, Inc.*, Case No. 2:15-cv-576-RWS-RSP, 2016 WL 7364266 (E.D. Tex. Dec. 19, 2016); *Syncpoint Imaging, LLC v. Nintendo of Am., Inc.*, Case No. 2:15-cv-00247-JRG-RSP, 2016 WL 55118 (E.D. Tex. Jan. 5, 2016). In none of these cases was there an unambiguous admission and subsequent acquiescence by the applicant that "processor" should be construed under 35 U.S.C. § 112 ¶ 6.

1376, 1379 (Fed. Cir. 2013)). "[I]n a means-plus-function claim in which the disclosed structure

is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure

is not the general purpose computer, but rather the special purpose computer programmed to

perform the disclosed algorithm. Consequently, a means-plus-function claim element for which

the only disclosed structure is a general purpose computer is invalid if the specification fails to

disclose an algorithm for performing the claimed function." *Blackboard, Inc. v. Desire2Learn,*

*Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009).

Here, IT admitted during the '247 patent's prosecution that the claim terms "processor

means" and "processor" correspond to microcontroller 310 (in Figure 3 of the '247 patent), *i.e.*, a

general purpose computer. *See* Section IV.A.1.a, *supra*. The specification confirms that

microcontroller 310 is a general-purpose computer. *See* Ex. 1 ('247 patent) at 4:64-5:16; Ex. 14

(Sharony decl.) at ¶ 15. The only remaining question is whether the '247 patent's specification

discloses an algorithm for performing the claimed function, "outputting at least one signal

adapted to engage or disengage at least one device through at least one connection standard when

in communication with an RFID circuit," as recited in the asserted claims.

The '247 patent fails to disclose an algorithm for performing the claimed function. There

is no disclosure in the patent of: (1) *how* microcontroller 310, or any other device, would

"output[] at least one signal"; (2) *how* that signal would be "adapted to engage or disengage at

least one device through at least one connection standard"; or (3) *how* the adapted signal would

be outputted "when in communication with," i.e., at the time of communication with, "an RFID

circuit." Ex. 14 (Sharony decl.) at ¶¶ 9-21. Because the '247 patent's specification fails to

disclose an algorithm for performing the claimed function, the "processor" phrase renders the asserted claims indefinite. *See Blackboard*, 574 F.3d at 1384.[7]

The prosecution history confirms these claims are indefinite. As discussed above, the examiner issued the following indefiniteness rejection:

> Claims 173, 176, 183 are further rejected in that the claim limitation 'processor' invokes 35 U.S.C. 112(f) or pre-AIA 35 U.S.C. 112, sixth paragraph. However, ***the written description fails to disclose the corresponding structure***, material, or acts for performing the entire claimed function ***and to clearly link the structure***, material, or acts ***to the function***. ***Therefore, the claim is indefinite*** and is rejected under 35 U.S.C. 112(b) or pre-AIA 35 U.S.C. 112, second paragraph.

Ex. 11 (6/29/2018 office action) at 22. IT did not contest the examiner's rejection or finding that the "written description fails to disclose the corresponding structure … for performing the entire claimed function and to clearly link the structure … to the function." Rather, IT acquiesced to the rejection and cancelled the rejected claims. Ex. 12 (8/29/18 amendment) at 53. IT's acquiescence belies any argument that the patent specification discloses an algorithm for performing the "processor" phrase's claimed function. *See SandBox Logistics*, 2020 WL 2517113, at *4; *see Tor-Pharm*, 336 F.3d at 1330; *Biogen Idec*, 713 F.3d at 1096.

IT's contrary position fails. The entirety of IT's proposal is "No construction necessary and/or plain and ordinary meaning." In other words, IT has offered no interpretation whatsoever of the "processor" phrase if it is found to invoke § 112 ¶ 6. In the meet and confer process, IT asserted that if the Court determines that § 112 ¶ 6 applies, IT will identify as corresponding structure the '247 patent's disclosure at 4:7-12. That patent disclosure appears below:

---

[7] The '247 patent contains a flow diagram (Figure 4) that purports to show "the usage of an RFID system in a safety or security application." Ex. 1 ('247 patent) at 3:53-54. However, neither the flow diagram nor its description (*id.* at 6:17-53) discloses any portion of the claimed function of the "processor" phrase, or even *which of the components* of a system could perform the steps depicted in the flow diagram. Ex. 14 (Sharony decl.) at ¶ 16. So even if IT contends Figure 4 discloses an algorithm, Figure 4 does not tether any specific function to a structure.

> In a preferred embodiment, however, the functions are performed by a processor such as a computer or an electronic data processor in accordance with code such as computer program code, software, and/or integrated circuits that are coded to perform such functions, unless indicated otherwise.

Ex. 1 ('247 patent) at 4:7-12. This boilerplate disclosure does not provide the required algorithmic support. Ex. 14 (Sharony decl.) at ¶ 18. At most, this language provides "a description of the outcome of the claimed functions, not a description of the structure, i.e., the computer programmed to execute a particular algorithm." *Aristocrat*, 521 F.3d at 1334-35. Simply reciting "software" or "code" "without providing some detail about the means to accomplish the function is not enough." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340-41 (Fed. Cir. 2008); *see Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012) (holding indefinite a claim reciting a computer-implemented means-plus-function term where "[t]he specification merely provide[d] functional language and d[id] not contain any step-by-step process" for performing the claimed function). This is insufficient support as a matter of law.

**C.** **If the "processor" phrase is not found to be indefinite, the "processor" phrase's construction must reflect the applicant's clear and unambiguous prosecution disclaimer.**

In the alternative, if the Court finds that the "processor" phrase is not indefinite, then the correct construction of the "processor" phrase must reflect the clear and unambiguous disclaimer made by the applicant during the '247 patent's prosecution in order to obtain the asserted claims over otherwise invalidating prior art. As established in detail below, the applicant's clear prosecution disclaimer mandates that the claimed "processor" cannot rely on any external computation device to control the "at least one device" recited in the claims.

During the patent's original prosecution, the applicant expressly and repeatedly distinguished its "present invention" from the prior art on the ground that its base unit does not

rely on an external computation device to control an external device. This disclaimer began with the applicant's attempt to overcome the examiner's first rejection based on the *Noble* reference. *See* Ex. 3 (9/21/2006 office action). In response, the applicant began by characterizing *Noble*'s FIG. 1A (below) as follows:



The reader 106 of Noble, after reading one or more tags, of the same type, transmits the data stored in the chip 112 to a data processing system 108. The reader [106] does not make any determination of whether or not there has been sufficient identification read. Rather reader 106 of Noble merely stores collected data for transmission to an external computation device via a single (1) external communication port (I/O port) that is unlabeled in FIGURES 1A or 1B.

Ex. 15 (*Noble*) at FIG. 1A; Ex. 5 (10/19/2006 amendment) at 8. The applicant next contrasted *Noble*'s FIG. 1A with the '247 patent's FIG. 3 (below) as follows:



*FIG. 3*

***The present invention is directed to a "smart" reader 304*** that is capable of reading RFID tags of multiple types and make determinations of whether or not the multiple tags read constitute sufficient identification information to warrant outputting a signal to some external device to be controlled through the use of a microcontroller 310. … As shown in FIGURE 3, the information or output signals from microcontroller 310 may additionally be output on any one of a plurality of communication standard ports such as shown via the ports labeled 316, 318, 320, 322, 324 and 326. These outputs may go to a computer network for distribution to working devices or may go directly to one or more automated devices like the one shown as block 330. ***The RFID reader of the present invention thus has internal logic capability to determine whether or not to activate a given device without having to use an external computation device as does Noble.***

19

Ex. 1 ('247 patent) at FIG. 3; Ex. 5 (10/19/2006 amendment) at 8. Thus, the applicant made it

clear that the "RFID reader of the present invention," unlike Noble's reader, "has internal logic

capability to determine whether or not to activate a given device *without having to use an*

*external computation device*." As a result, the applicant expressly and unambiguously

disclaimed reliance on an external computation device for activating a given device.

In the same response, the applicant made disclaimer arguments directed to prosecution

claim 31 specifically. (As discussed above, prosecution claim 31 issued as original claim 9, and

IT incorporated all of original claim 9's requirements into the asserted claims to overcome the

examiner's claim broadening rejections during reexamination.) The applicant drew a "clear

contrast" between *Noble* and prosecution claim 31:

> Independent Claim 31, similar to Claims 1 and 23, further recites
> that the base unit is smart enough to operate to engage or disengage
> the external device. ***In clear contrast to Applicant's invention as
> thus claimed***, Noble discloses the base unit 106 merely relaying
> information to a computer 108 through the use of a universal I/O
> port, and this computer 108 then makes a determination ***as to any
> control required***.

*Id.* at 9. This disclaimer could not be clearer: prosecution claim 31, unlike Noble's reader, does

not use an external computer to "make[] a determination ***as to any control required***."

Unpersuaded, the examiner issued a second rejection based on *Noble*. *See* Ex. 4

(1/16/2007 office action). In response, the applicant amended all four independent claims (claims

1, 23, 31, and 39). *See* Ex. 6 (2/9/2007 amendment) at 3-6. To claims 1, 23, and 39, the applicant

added the phrase "processor means," and to claim 31, the applicant added the word "processor"

(as discussed above in the indefiniteness argument). *Id.* Along with the claim amendments, the

applicant again characterized *Noble*'s FIG. 1A (above) and contrasted that figure with the

applicant's "present invention":

> Thus Noble does not have a "control module" in reader 106. Rather, the function of the control module is performed by the data processing means 118, which constitutes part of a separate device that may be located a great distance away. ***In contrast to Noble, the present invention incorporates a processor in the RFID base unit which base unit*** is essentially a "smart" or "intelligent" reader. ***With this base unit or reader intelligent decisions can be instantly made within the reader and appropriate outputs can be applied to external devices without waiting for a response from a remote computer that would then be utilized to control a local or otherwise nearby external device.***

*Id.* at 7. Thus, yet again, the applicant made it clear that its "present invention," unlike Noble's reader, does not utilize an external computer but instead incorporates a processor into the base unit. The applicant argued that its "present invention" is capable of "making determinations of whether or not the multiple tags read constitute sufficient identification information to warrant outputting a signal to some external device (not a data processing system as shown in Noble) to be controlled through the use of a processor (microcontroller 310)." *Id.* at 8. Leaving no doubt that the applicant's "present invention" uses no external computation hardware, the applicant further contrasted "the processor 118 of Noble external to [Noble's] reader" with "the in-reader performance ***of the present invention***" and asserted that "the use of processor (microcontroller) 310" permits "data retrieved from a RFID" to "be formatted to one or more different communication standards ***without additional hardware***."

Applicant's disclaimer is clear: it repeatedly told the examiner and the public that its claimed "processor" does not rely on any external computation device for controlling any device. The claimed "processor" cannot cover what the applicant disclaimed. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers."); *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002) ("Explicit arguments made during prosecution to overcome prior art can lead to a narrow claim interpretation because '[t]he public has a right

to rely on such definitive statements made during prosecution.'"); *Gillespie v. Dywidag Systs. Int'l, USA*, 501 F.3d 1285, 1291 (Fed. Cir. 2007) ("The patentee is held to what he declares during the prosecution of his patent."); *Technology Properties Limited LLC v. Huawei Technologies Co., Ltd.*, 849 F.3d 1349 (Fed. Cir. 2017) ("the scope of surrender is not limited to what is absolutely necessary to avoid a prior art reference; patentees may surrender more than necessary"); *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1379 (Fed. Cir. 2008) (holding that "the sum of the patentees' statements during prosecution would lead a competitor to believe that the patentee had disavowed coverage of laptops" and, thus, affirming the trial court's construction of the portable computer limitation); *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1372-75 (Fed. Cir. 2005) ("Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language.").

Therefore, if the Court finds that the "processor" phrase is not indefinite, then the correct construction of the "processor" phrase must reflect the applicant's clear and unambiguous disclaimer, as reflected in Zebra's proposed language "without using an external computation device to control the at least one device."

## V.    "Bluetooth," "RFID," and "USB" ("the industry standard terms")

| Term | Zebra's position | IT's position |
|---|---|---|
| Bluetooth | Bluetooth as described in the Bluetooth specifications existing at the time of the claimed invention | No construction necessary and/or plain and ordinary meaning.<br><br>Alternatively, if the Court finds it necessary to construe this term, the construction should be "Bluetooth is any wireless interfacing standard compatible with the standards defined by the Bluetooth Special Interest Group." |
| RFID | Radio Frequency Identification as described in the Radio | No construction necessary and/or plain and ordinary meaning. |

| Term | Zebra's position | IT's position |
|------|------------------|---------------|
| | Frequency Identification specifications existing at the time of the claimed invention | Alternatively, if the Court finds it necessary to construe this term, the construction should be "Radio Frequency Identification ("RFID") is any technology that uses radio waves to receive, transmit, or relay identifying signals." |
| USB | Universal Serial Bus as described in the Universal Serial Bus specifications existing at the time of the claimed invention. | No construction necessary and/or plain and ordinary meaning.<br><br>Alternatively, if the Court finds it necessary to construe this term, the construction should be |

### A. "Bluetooth," "RFID," and "USB" should be construed according to their respective specifications.

The '247 patent claim language indicates no special or unusual use of "Bluetooth," "RFID," or "USB" (the "industry standard terms"). The specification uses the industry standard terms with no suggestion that the patentee acted as its own lexicographer or tried to redefine the terms. For example, the specification refers to "RFID tags that are commercially available." Ex. 1 ('247 patent) at Abstract. This is consistent with the patentee's use of "RFID" to refer to a particular industry "standard":

> Additionally, the RF link 332 can be of multiple frequencies to communicate with *standard* low frequency *RFID* tags (between 125 kHz to 134 kHz), *standard* high frequency *RFID* tags (13.56 Mhz), *standard* Ultra High Frequency (UHF) *RFID* tags (868 Mhz to 956 MHz), and *standard* microwave *RFID* tags (2.45 GHz).

*Id.* at 4:32-38. Likewise, the patentee identified "Bluetooth" and "USB" as "standards":

> 10. The apparatus of claim 9, wherein the plurality of communication *standards* further comprises *BlueTooth*, RS232, *Universal Serial Bus (USB)*, Ethernet, Wireless, T-carrier connections, FIREWIRE, Optical fiber, ZIGBEE, and Voice over Internet Protocol (VoIP).

Ex. 1 ('247 patent) at cl. 10; *see also id.* at cls. 3, 13. Therefore, persons skilled in the art would understand the industry standard terms to be as described in their respective specifications.

This construction is consistent with the central motivation of the claimed invention: to achieve interoperability between standard RFID tags and external devices using certain standard connection types—including Bluetooth and USB. Ex. 1 ('247 patent) at 4:61-5:10 ("the RFID base unit 304 can be coupled to a variety of other devices . . . through BlueTooth, RS232, Universal Serial Bus (USB), Ethernet, Wireless, T-carrier connections, Firewire®. . ."). The industry standard terms should thus be construed consistently throughout the claims to be the technology disclosed in the specifications for "Bluetooth," "RFID," and "USB." *DisplayLink Corp. v. Magic Control Tech. Corp.*, 615 F. Supp. 2d 1051, 1055-57 (N.D. Cal. 2009) ("[Persons skilled in the art] understood USB to be the technology disclosed in the 2.0 specification (or the earlier versions) and what they would necessarily look to in order to design a USB compliant product"); *Chamberlain Grp., Inc. v. Lear Corp.*, 516 F.3d 1331, 1337 (Fed. Cir. 2008) (terms "presumptively should carry the same meaning throughout the patent").

**B.      "Bluetooth," "RFID," and "USB" should be limited to Bluetooth, RFID, and USB at the time of the claimed invention.**

It is axiomatic that claims should be given the meaning they would have to persons skilled in the art "at the time of the invention." *Phillips*, 415 F.3d at 1313. Consistent with this black letter law, courts have repeatedly construed industry standard terms to exclude future-arising standards. *PC Connector Sols. LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1361-64 (Fed. Cir. 2005) ("standard input/output port" limited to ports existing at time of filing); *Fundamental Innovation Sys. Int'l LLC v. Samsung Elecs. Co.*, Case No. 2:17-CV-145-JRG-RSP, 2018 WL 647734, at *11 (E.D. Tex. Jan. 31, 2018) ("'USB' . . . should be limited to the Universal Serial Bus standards that existed at the time of the claimed invention."); *Chrimar Sys., Inc. v. Alcatel-*

*Lucent USA, Inc.*, Case No. 6:15-cv-163-JRG-JDL, 2016 WL 1228767, at *8-9 (E.D. Tex. Mar. 28, 2016) ("BaseT" limited to BaseT at time of the invention, excluding after-arising BaseT); *Extreme Networks, Inc. v. Enterasys Networks, Inc.*, 2007 WL 5601497, at *16-17 (W.D. Wis. Nov. 21, 2007) ("IEEE 802 [term]" construed as "[term] compliant with all IEEE 802 standards, as those standards existed on [the date of the invention]").

Likewise here, the industry standard terms must be limited to their respective standards at the time of the claimed invention, and cannot encompass after-arising standards. For example, since 2005, the USB Implementer's Forum has issued multiple new standards under the USB umbrella, including USB Battery Charging (2007), USB 3.0 (2008), USB Power Delivery (2012), and USB Type-C (2014). *See* Ex. 16 (Listing of USB specifications) at IT022801. In addition, the Bluetooth SIG has issued eight major standard updates since version 2.0 of the standard was issued in 2004. Such new standards, now at Version 5.2, include new features such as High-Speed Transport (AMP) (Version 3.0 - 2009), Bluetooth Low Energy (Version 4.0 - 2010), support for Internet of Things devices (Version 4.2 - 2014) and increases in transmission rates (Version 5.0 - 2016). *See* Ex. 17 (Excerpt of Bluetooth core specification version 5.2) at IT019053-58.

These standards have drastically shifted and changed the meaning of device compatibility, data conditions, communication distances, connectors and frequency ranges, among other things. These differences go to the essence of the claimed invention. For instance, where the patentee claimed a RFID reader that can communicate with multiple standard RFID tags, today's RFID readers rely on fundamentally different communication protocols. *See* Ex. 1 ('247 patent) at 3:20-23 ("there is a need for a method and/or apparatus for communicating with a multitude of devices and RFID tags that at least addresses some of the problems associated

with conventional RFID base units."). To include this modern USB, Bluetooth, and RFID technology would render the claims nonsensical, and flout basic claim construction law: "A claim cannot have different meanings at different times; its meaning must be interpreted as of its effective filing date." *PC Connector,* 406 F.3d at 1363.

       **C.**     **IT's claim construction approach should be rejected.**

IT offers plain and ordinary meaning constructions or, alternatively, constructions that impermissibly incorporate later-arising standard technology. *PC Connector*, 406 F.3d at 1361.

In fact, with respect to "RFID," IT departs even further from the patent specification by incorporating "*any technology* that uses radio waves to receive, transmit, or rely identifying signals." This includes a broad array of communication protocols across the electromagnetic spectrum, including radar, microwave satellites, Wi-Fi, cellular, Near-Field Communication (NFC), television, FM radio, CB radio, AM radio, and maritime radio to name a few. IT's proposed "RFID" construction contradicts the specification, which specifically recites Bluetooth, Wireless and Zigbee as separate from RFID. *See, e.g.*, Ex. 1 ('247 patent) at 5:8-11, cl. 3, FIG. 3. Yet, under IT's proposed construction, each of these radio wave technologies is a type of RFID. IT's proposed construction improperly captures these other existing standards as well as later-arising standards that uses radio waves.

IT's attempt to impermissibly broaden the scope of the industry standard terms to capture later-arising technology and even other existing technology should be rejected.

       **D.**     **If the industry standard terms are not temporally limited, then they render the asserted claims indefinite.**

Without temporal limitation, industry standard terms would cover anything and everything adopted by a consensual standardization organization under the Bluetooth, RFID or USB umbrellas (and in the case of RFID, any new radio wave technology). The meaning of

claim terms would shift from day to day based on the decisions of industry participants unrelated to the technology or disclosure of the patents. This is inconsistent with the statutory public-notice function of definiteness and would "foster the innovation-discouraging 'zone of uncertainty,' against which [the Supreme Court] has warned." *Nautilus*, 572 U.S. at 910; *Versata Software, Inc. v. Zoho Corp.*, 213 F. Supp. 3d 829, 838 (W.D. Tex. 2016) ("A claim term cannot be a moving target that changes over time.").

## VI.     **"battery"**

"Battery" appears in claims 48, 63, 88, 117, 130, 144, and 151.

| Zebra's position | IT's position |
|---|---|
| No construction is required.<br><br>If the Court finds it necessary to construe this term, this term should be given its plain and ordinary meaning: "a power source comprising one or more cells." | "A power source" |

The parties dispute whether "battery" covers *any* power source (IT's proposal) or a power source comprising one or more cells (Zebra's proposal). The correct construction of "battery" is "a power source comprising one or more cells."

The intrinsic record does not use "battery" to cover all possible power sources. Consistent with the term's normal usage, the specification uses "battery" as a ***type*** of power source:

> The RFID base unit 304 can also be designed to be robust and powered by ***a variety of power sources***. For example, the RFID base unit 304 can be powered by standard 110 VAC, ***batteries, rechargeable batteries***, power over Ethernet, power over USB, etc.

Ex. 1 ('247 patent) at 4:38-42. In listing power sources, the specification identifies not only batteries and rechargeable batteries, but also 110 VAC, power over Ethernet, and power over USB. From this intrinsic evidence, therefore, skilled artisans would have understood that a battery is one type of power source, but not every power source is a battery. Zebra's proposed

27

construction correctly limits "battery" to a power source with cell(s) in order to capture batteries as understood in normal usage without covering other types of power sources (e.g., 110 VAC, power over Ethernet, power over USB). IT's construction, on the other hand, incorrectly covers *any* power source, even those that the specification does not identify as batteries (e.g., standard 110 VAC, power over Ethernet, power over USB).

## VII.   "microcontroller"

"Microcontroller" appears in claims 49, 63, 70, 73, 75, 82, 88, 149, and 154.

| Zebra's position | IT's position |
|---|---|
| No construction is required.<br><br>If the Court finds it necessary to construe this term, this term should be given its plain and ordinary meaning: "one or more electronic components that control a circuit." | "A programmable machine comprising one or more electronic components that can receive, store, load, process, and transmit data and instructions" |

Figure 3 of the '247 patent includes a "black box" designated by the label "microcontroller 310." In describing microcontroller 310, the patent provides only generalized statements about the microcontroller's optional capabilities. For example, the specification states, "the microcontroller 310 *can be* flexible" (*id.* at 4:63-64), "standard operating systems … *can be* readily usable with the microcontroller 310" (*id.* at 5:2-5), and "the microcontroller 310 *can also be* equipped to communicate with" other devices (*id.* at 5:6-13). But the patent discloses no specific structure for the microprocessor 310, nor does the patent disclose any algorithm through which the microcontroller 310 would perform any function. Based on the patent's black-box disclosure of microcontroller 310, skilled artisans would have understood "microcontroller" as a general-purpose computer, *i.e.*, one or more components that control a circuit.

Although the intrinsic record is devoid of details about microprocessor 310, IT through its construction seeks to impose limitations on "microprocessor" unsupported by the intrinsic

28

record. For example, IT's construction requires that the "microcontroller" "can receive, store, load, process, and transmit data and instructions," yet nothing in the intrinsic record requires the "microcontroller" to perform or be able to perform functions. Beyond being unsupported, IT's proposed construction injects ambiguity into the claims by defining "microprocessor" in terms of what it ***can*** do rather than what it ***must*** do.

## VIII.   "connection standard"

"Connection standard" appears in claims 48, 63, 88, 117, 129, 130, 131, 132, 138, 144, 149, and 154. The parties have agreed that "connection standard" should be construed as "standard through which the RFID base unit connects with the at least one device."

Date: July 29, 2020

Respectfully submitted,

/s/ *Brent A. Hawkins*
Brent A. Hawkins*
California Bar No. 314266
Illinois Bar No. 6243086
brent.hawkins@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 442-1001

Hersh Mehta*
Illinois Bar No. 6306586
Amanda S. Williamson*
Illinois Bar No. 6280051
James J. Kritsas*
Illinois Bar No. 6313286
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, IL 60601
Telephone: (312) 324-1000
Facsimile: (312) 324-1001

*Admitted pro hac*

Elizabeth M. Chiaviello
Texas Bar No. 24088913
elizabeth.chiaviello@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, Texas 77002-5006
T. 713.890.5000
F. 713.890.5001

**Attorneys for Defendant**
**Zebra Technologies Corporation**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned counsel hereby certifies that on July 29, 2020, a true and correct copy of the foregoing document was served on all counsel of record who have appeared in this case via the Court's CM/ECF system per Local Rule CV-5.

By:    <u>*/s/ Brent A. Hawkins*</u>
             Brent A. Hawkins