**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| INTELLECTUAL TECH LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 6:19-cv-00628 |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| ZEBRA TECHNOLOGIES | § | |
| CORPORATION, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFF INTELLECTUAL TECH LLC'S RESPONSE TO ZEBRA'S MOTION
FOR SUMMARY JUDGMENT OF INVALIDITY UNDER 35 U.S.C. § 112**

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ................................................................................................ 2

    A.   The '247 Patent ...................................................................................... 2

    B.   Relevant Prosecution History ................................................................ 6

III. LEGAL STANDARD ........................................................................................ 8

    A.   Summary Judgment and Standard of Proof ........................................... 8

    B.   Written Description................................................................................. 9

IV.  ARGUMENT .................................................................................................. 10

    A.   The '247 Patent Teaches "a processor wherein…the processor is configured for outputting at least one signal …when in communication with an RFID circuit". 10

    B.   The '247 Patent Teaches "a processor wherein…the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard…" ....................................................... 15

V.   CONCLUSION................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A*,
  657 F.3d 1264 (Fed. Cir. 2011) ................................................................................ 14

*Alcon Research Ltd. v. Barr Labs., Inc.*,
  745 F.3d 1180 (Fed. Cir. 2014) .................................................................................. 9

*Allergan, Inc. v. Alcon Inc.*,
  No. CIV.A. 04-968 GMS, 2005 WL 3336535 (D. Del. Dec. 8, 2005) ................................ 2, 8

*Allure Energy, Inc. v. Nest Labs, Inc.*,
  No. 9-13-CV-102, 2015 WL 11110607 (E.D. Tex. May 11, 2015) ...................................... 2, 8

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................ 1

*In re Anderson*,
  471 F.2d 1237, 176 USPQ 331 (CCPA 1973) ................................................................ 20

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) ...................................................................... *passim*

*Blue Calypso, LLC v. Groupon, Inc.*,
  815 F.3d 1331 (Fed. Cir. 2016) ....................................................... 10, 13, 18, 20

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................... 8

*Centrak, Inc. v. Sonitor Techs., Inc.*,
  915 F.3d 1360 (Fed. Cir. 2019) ...................................................................... *passim*

*Finisar Corp. v. DirecTV Grp., Inc.*,
  523 F.3d 1323 (Fed. Cir. 2008) ................................................................................ 19

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  645 F.3d 1336 (Fed. Cir. 2011) ............................................................................. 1, 8

*Immunex Corp. v. Sandoz Inc.*,
  964 F.3d 1049 (Fed. Cir. 2020) ................................................................................ 17

*Imonex Servs., Inc. v. W H Munzprufer Dietmar Trenner GMBH*,
  No. CIV.A. 2:01-CV174TJW, 2002 WL 34455164 (E.D. Tex. Oct. 25, 2002) ....................... 12

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004)..................................................................................13

*Intirtool, Ltd. v. Texar Corp.*,
    369 F.3d 1289 (Fed. Cir. 2004)..................................................................................1, 8

*Kaneka Corp. v. JBS Hair, Inc.*,
    No. 3:10-CV-01430-P, 2013 WL 12123947 (N.D. Tex. May 21, 2013)..................9

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005)..................................................................................9

*Motio, Inc. v. BSP Software LLC*,
    No. 4:12-CV-647, 2015 WL 5016945 (E.D. Tex. Aug. 21, 2015)........................2, 8

*Noah Sys., Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012)..................................................................................18

*O.I. Corp. v. Tekmar Co.*,
    115 F.3d 1576 (Fed. Cir. 1997)..................................................................................12

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)................................................................15

*In re Qualcomm Litig.*,
    No. 17-CV-00108-GPC-MDD, 2018 WL 1406944 (S.D. Cal. Mar. 21, 2018) .....................12

*ROY-G-BIV Corp. v. ABB, Ltd.*,
    63 F. Supp. 3d 690 (E.D. Tex. 2014)........................................................................2, 8

*Spectrum Ass'n Mgmt. of Texas, LLC v. Lifetime HOA Mgmt.*,
    LLC, No. 5:18-CV-00940-ADA, 2019 WL 7759343 (W.D. Tex. Oct. 29, 2019) .................8

*Union Oil Co. of California v. Atl. Richfield Co.*,
    208 F.3d 989 (Fed. Cir. 2000)...................................................................................9, 15, 20

*Zoltek Corp. v. United States*,
    815 F.3d 1302 (Fed. Cir. 2016)..................................................................................17

**Statutes**

35 U.S.C. § 112, ¶ 1 ......................................................................................................9

35 U.S.C. § 282................................................................................................................1, 8

35 U.S.C. §§ 302-307 .....................................................................................................7

**Other Authorities**

37 C.F.R. § 1.510 ................................................................................................................. 7

Fed. R. Civ. P. 56(c) .......................................................................................................... 8

**TABLE OF EXHIBITS**

| Exhibit No. | Description |
|:---:|:---|
| 1 | U.S. Patent No. 7,233,247 |
| 2 | U.S. Patent No. 7,233,247 C1 *Ex Parte* Reexamination Certificate |
| 3 | 2/9/2007 Claim Amendment |
| 4 | 2/9/2007 Response to Office Action |
| 5 | 4/18/2007 Notice of Allowability |
| 6 | 9/1/2017 Request for *Ex Parte* Reexamination of U.S. Patent No. 7,233,247 |
| 7 | 8/29/2018 Reexamination Response to Second Office Action |
| 8 | 4/15/2019 Notice of Intent to Issue *Ex Parte* Reexamination Certificate |
| 9 | 1/20/2005 Original Claims of U.S. Patent No. 7,233,247 |
| 10 | Declaration of Jeffrey J. Rodriguez, Ph.D. |

Plaintiff Intellectual Tech LLC ("Intellectual Tech") hereby provides its Response to Zebra Technologies Corporation's ("Zebra") Motion for Summary Judgment of Invalidity under Sect. 112, first paragraph [Dkt. 54] regarding written description of U.S. Pat. No. 7,233,247 ("the '247 Patent," attached as Exs. 1 and 2). The Court has denied Zebra's motion on indefiniteness. Dkt. 57. Accordingly, Intellectual Tech only addresses the issue of written description.

## I.    INTRODUCTION

The '247 Patent is presumed valid. 35 U.S.C. § 282. Via its summary judgment motion, Zebra has the high burden of establishing by clear and convincing evidence that the '247 Patent fails to comply with the written description requirement. *Hynix Semiconductor Inc. v. Rambus Inc*., 645 F.3d 1336, 1351 (Fed. Cir. 2011); *Intirtool, Ltd. v. Texar Corp*., 369 F.3d 1289, 1294 (Fed. Cir. 2004). To do so, Zebra has to unequivocally show that the disclosure of the '247 Patent does not "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co*., 598 F.3d 1336, 1351 (Fed. Cir. 2010). The question is one of fact. *Centrak, Inc. v. Sonitor Techs., Inc*., 915 F.3d 1360, 1365 (Fed. Cir. 2019). The facts here support Intellectual Tech and all justified inferences from them must be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

> Fact No. 1: Zebra's own expert admits that reading the specification of the '247 Patent and depending on the specific device and application at issue, he would know exactly how to configure a processor to output a signal adapted to engage or disengage a device when the base unit is in communication with an RFID circuit of an RFID tag. Dkt. 54-16 ¶ 42.

> Fact No. 2: With respect to the "at least one signal adapted to engage or disengage at least one device…." Zebra and its expert admit "the specification discloses the source of that signal (microcontroller 310 in FIG. 3), the medium through which the signal would be transmitted (connection standards 316, 318, 320, 322, and 324 in FIG. 3) and the destination of that signal (a device on computer network 314 in FIG. 3)." *Id. See* Dkt. 54 at 9-10; Dkt. 54-16 ¶ 37.

> Fact No. 3: The specification teaches multiple embodiments where the RFID base unit sends signals in order to engage or disengage a device. *See, e.g.*, '247 Patent at 3:33-36; 5:37-50; 5:43-65; 6:17-45; Figs. 3 and 4.

Fact No. 4: The originally submitted claim that issued as Claim 9 and that was later incorporated into the asserted reexamined claims always included the limitation that the RFID base unit be "configured to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit." Exs. 3 and 4.

Fact No. 5: Zebra's second attempt to construe the processor phrase by replacing the term "when" in the phrase "when in communication with an RFID circuit" with "at the time of" is based on a single conclusory sentence from its expert. Dkt. 54 at 9; Dkt. 54-16 ¶ 33.

Fact No. 6: The '247 Patent is replete with disclosure that teaches the limitation "the processor configured for outputting at least one signal…when in communication with an RFID circuit." *See, e.g.*, '247 Patent at 3:26-36; 4:5-12; 4:24-32; 4:61-5:16; 5:37-50; 5:66-6:3; 6:17-45.

Fact No. 7: Intellectual Tech's expert, Dr. Jeff Rodriguez, disputes the findings of Zebra's expert and unequivocally opines in a well-supported declaration that the '247 Patent teaches and discloses the limitations of the asserted patents. The fact of the presence of conflicting expert testimony alone is sufficient to defeat summary judgment. *See generally* Ex. 10 (Dr. Rodriguez Expert Declaration); *see e.g.*, *Allure Energy, Inc. v. Nest Labs, Inc.*, No. 9-13-CV-102, 2015 WL 11110607, at *2 (E.D. Tex. May 11, 2015); *Motio, Inc. v. BSP Software LLC*, No. 4:12-CV-647, 2015 WL 5016945, at *7 (E.D. Tex. Aug. 21, 2015); *ROY-G-BIV Corp. v. ABB, Ltd.*, 63 F. Supp. 3d 690, 697 (E.D. Tex. 2014); *Allergan, Inc. v. Alcon Inc.*, No. CIV.A. 04-968 GMS, 2005 WL 3336535, at *9 (D. Del. Dec. 8, 2005).

A more fundamental fact is that Zebra attempted these arguments during claim construction and lost. *See* Dkts. 43, 45, 46. The Court rejected Zebra's aim at invalidating the asserted claims based on indefiniteness and has made clear that "it has not since changed its position." Dkts. 52 & 57. Although guised in the form of summary judgment, Zebra's arguments are essentially the same and should be rejected once more.

## II.  BACKGROUND

### A.  The '247 Patent

The '247 Patent, entitled "Method and System for Employing RFID Tags in Automated Applications," was filed on January 20, 2005, and successfully underwent reexamination on June 7, 2019. Exs. 1-2. The '247 Patent discloses an RFID base unit that can communicate with different types of RFID tags and any number of devices, "which allow for dynamic access and updates to tailor the RFID base unit for virtually any situation." *Id.*; *see also* Dkt. 52 at 2. The claimed RFID

base unit is useful, for example, in "safety and/or security applications to enable or disable automated devices" (*id.*), "to discontinue the operation of other devices" (*id.* at 5:51-52), or "to gain access to a device or area" (*id.* at 6:33-34). *See also id.* at 5:50-6:54.

Traditionally, RFID base units were only tailored for specific types of tags and for specific applications, creating inflexible systems. *Id.* at 3:14-17. At the time of the invention, RFID base units were also not easily monitored, leaving users unaware of an RFID base unit's status or operation. *Id.*; *see also id.* at 5:24-27. The '247 Patent changed that. "Once the at least one RFID tag interfaces with the RFID base unit," the '247 Patent teaches in the Summary of the Invention, "indicia of engagement, disengagement or other effect on the control or operation is communicated to the external device." *Id.* 3:31-36; *see also* Dkt. 52, Markman Order, at 2. The "indicia of engagement" is described as the transmission of a signal. *See, e.g.*, *id.* at 5:43-65; Rodriguez Dec. ¶ 24. For example, the specification teaches that the claimed RFID base unit can send and receive "digital and/or relay signals":

> The RFID base unit 304, though, has significant potential in controlling the operation of other external devices. For example, the RFID base unit 304 could be coupled to an automated device 330 by a communication channel 328. Automation equipment 330 can also be connected directly to the I/O module. The RFID base unit 304 can then enable or disable access to the automated device 330. The RFID base unit 304 can also be coupled to an I/O device 338 through the communication channel 340, ***where the RFID base unit 304 can be configured to receive and/or transmit digital and/or relay signals***.

*Id.* at 5:37-50. In one embodiment, the specification teaches that the RFID base unit "can also be used to discontinue the operation of other external devices." *Id.* at 5:51-52. In that regard, the specification describes that "the RFID base unit 304 could be employed ***to signal a controller*** if the proper operator is not present and/or in an acceptable location to operate a device." *Id.* at 5:60-65. One skilled in the art understands that in order to "signal a controller," the RFID base unit sends a signal. *See* Rodriguez Dec. ¶ 25. To send that signal, the '247 Patent teaches that the RFID

base unit must "interface"—i.e., come in the proximity of or otherwise engage—an RFID circuit of an RFID tag. *Id.* (citing the '247 Patent at 3:31-36).

With reference to Fig. 3, in one embodiment, the '247 Patent teaches an RFID base unit that includes an RF circuitry 308, an antenna 309, a microcontroller 310, and an RF Integrated Circuit (RFIC) 312. '247 Patent at 4:24-30; Fig. 3 (annotations added). "[B]ased on the configuration desired, the RFID base unit 304 can be coupled to a variety of other devices." *Id.* 4:61-62. In order to do so, the '247 Patent teaches a "flexible" microcontroller that includes memory (such as expandable volatile memory, DRAM, hard disk



*FIG. 3*

drives, flash memory sticks and the like), an operating system, and the ability to communicate with a computer networks and devices of various kinds through communication channels (such as Bluetooth, RS232, USB, Ethernet, and other wireless and wired technologies). *Id.* at 4:61-5:16.

The '247 Patent further teaches that the RFIC is coupled to the RF circuitry and the microcontroller through the communication channels, and the RF circuitry "communicates information to and from the RFID tag 302 by utilizing the antenna 309 and the RF link 332." *Id.* 4:25-33. As discussed above, "communicat[ing] information to and from the RFID tag" occurs when the base unit and the RFID tag "interface." *Id.* at 3:31-32 ("An RFID tag then interfaces with the RFID base unit…"). After the RFID base unit and the RFID tag have established communication, the RFID base unit can send a signal to an external device. *Id.* at 3:33-36 ("Once

the at least one RFID tag interfaces with the RFID base unit, indicia of engagement, disengagement or other affect [*sic*] on the control or operation is communicated to the external device.").

Figure 4 illustrates an example of the functionality of the claimed RFID base unit within an RFID system in an industrial application using an algorithm provided in the form of a flowchart. '247 Patent at 6:17-21; Rodriguez Dec. ¶¶ 30, 80-88. In the first step, an RFID base unit interfaces with an RFID tag, energizing the tag and receiving its identification information (ID). *Id.* at 6:22-25. Depending on whether the ID is correct, access to a device or area is granted or denied. *Id.* at 6:26-29; *see also id.* at 6:29-45. If the ID is correct, in some applications, a



**FIG. 4**

determination is made as to whether a secondary ID is needed, such as biometric information or ID from a tag of a second accompanying user. *Id.* at 6:45-53. Finally, access is granted or denied. *Id.* Allowing access to a device or area requires the RFID base unit to communicate its determination to a device through communication channels such as Bluetooth using a signal. *See, e.g.*, *id.* at 3:26-36; 4:61-5:16; 5:37-50; *see also* Rodriguez Dec. ¶ 31. The RFID base unit sends that signal when it is in communication with an RFID tag. *Id.*

In a preferred embodiment, the functions described in the '247 Patent "are **performed by a processor** in accordance with code such as computer program code, software, and/or integrated circuits that are coded to perform such functions." '247 Patent at 4:7-12 (emphasis added). Although amended during prosecution, the originally submitted claims of the '247 Patent included embodiments describing "a processing system" that was coupled to the RFIC and, in some cases,

an operating system and/or a microcontroller. *See* Ex. 9 (Original Claims) at 18. As to the specific

lines of code or details of the program needed for the processor to perform the claimed functions,

the '247 Patent explicitly rejects limiting the disclosed inventions to a single implementation:

> In operation*, there* [*sic*] *a number of configurations that can be employed*. …Depending on the type of RFID tag 302 desired, the RFID base unit 304 is equipped to communicate with any type of RFID tag. 4:18-24.

> Specifically, the RFID base unit 304 is *designed to have a great deal of flexibility*. There are a *large number of combinations* of devices, RFID tags, and *communication techniques that can be employed to yield that flexibility*. 6:9-16.

> It is understood that the present invention *can take many forms and embodiments*….The capabilities outlined herein *allow for the possibility of a variety of programming models*. This disclosure should not be read as preferring *any particular programming model, but is instead directed to the underlying mechanisms on which these programming models can be built*. Col. 6:55-63; *see also* 4:62-64; 5:22-34.

Instead, the specification relies on the knowledge of one skilled in the art to program specific

functionality of the RFID base unit in accordance with the needs of the application(s) the RFID

base unit is used in. *See* '247 Patent at 7:3-8 ("Many such variations and modifications may be

considered desirable by those skilled in the art based upon a review of the foregoing description

of preferred embodiments."); Rodriguez Dec. ¶¶ 35, 62-74.

### B.    Relevant Prosecution History

Intellectual Tech described much of the relevant prosecution history of the '247 Patent in

its Response Claim Construction Brief. *See* Dkt. 44 at 2-8, incorporated herein by reference. The

discussion below supplements that summary.

#### 1.    *Original Prosecution*

The limitation "a processor wherein . . . the processor is configured for outputting at least

one signal adapted to engage or disengage at least one device through at least one connection

standard when in communication with an RFID circuit" was a limitation of issued Claim 9 and incorporated into all of the independent claims of the reexamined claims, including those that are asserted in this case. *See* Ex. 1 at Claim 9; Ex. 9 (Original Claims) at 23; Ex. 3 (2007/02/09 Claim Amd) at 4-5. Contrary to Zebra's assertion, the "processor phrase" was not a wholesale addition to the original claims. *See* Dkt. 54 at 5, 10-11; Ex. 4 (2007/02/09 Response to Office Action) at 8. The phrase "configured to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit" was part of the originally submitted claim. *See* Ex. 9 at 23. The applicant added the phrases "processor" and "outputting at least one signal adapted to" to clarify the scope of the invention. *See* Ex. 3 (2007/02/09 Claim Amd) at 4-5.

Significantly, the examiner accepted the Applicant's amended claims and did not raise an issue of written description or assert that the amendment added new matter. Instead, the examiner issued a notice of allowance. *See* Ex. 5 (2007/04/18 Notice of Allowability) at 2-3.

## 2. *Ex Parte Reexamination*

On September 1, 2017, and pursuant to 35 U.S.C. §§ 302-307 and 37 C.F.R. § 1.510, Intellectual Tech requested reexamination of all fifteen claims of the '247 Patent. *See generally* Ex. 6 (9/1/2017 Request for *Ex Parte* Reexam). During prosecution, Intellectual Tech added "the subject matter of originally issued claim 9" to all pending independent claims in order to address a broadening rejection. Ex. 7 (8/29/2018 Reexam Response to Second OA) at 53-55. With the addition of other minor amendments, the examiner allowed the pending claims and issued a reexamination certificate on June 7, 2019. *See* Ex. 8 (4/15/2019 Notice of Intent to Issue Reexam Cert.); Dkt. 42-2. Intellectual Tech asserts certain of the reexamined claims against Zebra.[1]

---

[1]The asserted claims are claims 48-61, 63, 65-79, 81-90, 117-120, 129-144, 146, 147, 149-152, and 154-159.

## III. LEGAL STANDARD

### A. Summary Judgment and Standard of Proof

This Court is well familiar with the law of summary judgment. *See Spectrum Ass'n Mgmt. of Texas, LLC v. Lifetime HOA Mgmt.*, LLC, No. 5:18-CV-00940-ADA, 2019 WL 7759343, at *1 (W.D. Tex. Oct. 29, 2019). Briefly, on summary judgment, the moving party has burden of showing that there is no genuine issue of material fact and that judgment should be entered as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255.

In light of the presumption of validity, Zebra has the high burden of establishing by clear and convincing evidence that the '247 Patent is invalid. 35 U.S.C. § 282; *Hynix Semiconductor*, 645 F.3d at 1351 (Fed. Cir. 2011); *Intirtool*, 369 F.3d at 1294 (Fed. Cir. 2004). The issue of whether a claimed invention satisfies the written description requirement is a question of fact. *Centrak*, 915 F.3d at 1365 (Fed. Cir. 2019). Differences in expert opinion regarding written description create a genuine issue of material fact sufficient to defeat summary judgment. *See, e.g.*, *Allure Energy*, 2015 WL 11110607, at *2 (finding disagreement between qualified experts precludes summary judgment); *Motio*, 2015 WL 5016945, at *7 (same); *Allergan*, 2005 WL 3336535, at *9 (same); *ROY-G-BIV*, 63 F. Supp. 3d at 697 ("That each party's expert comes to a different conclusion on this issue demonstrates that genuine issues of material fact remain that preclude summary judgment.").

In this case, Intellectual Tech's expert, Dr. Jeff Rodriguez, has provided a detailed analysis of the '247 Patent and its teachings, disputing Zebra and its expert's contentions. *See generally* Ex. 10. Dr. Rodriguez's testimony and an objective analysis of the intrinsic record provide sufficient basis to deny Zebra's motion. *See id.*; *Kaneka Corp. v. JBS Hair, Inc*., No. 3:10-CV-

01430-P, 2013 WL 12123947, at *12 (N.D. Tex. May 21, 2013) (denying summary judgment because the record as a whole created a genuine issue of material fact).

### B.    Written Description

Section 112, first paragraph, has two separate requirements: written description and enablement, both of which are described from the perspective of one skilled in the art. 35 U.S.C. § 112, ¶ 1; *Ariad Pharm*, 598 F.3d at 1344 (Fed. Cir. 2010). The inquiry here is only with respect to the statute's written description requirement. *See* Dkt. 54 at 6-7. The test for written description is "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm*, 598 F.3d. at 1351. "[W]ritten description is about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described; *it is not about* whether the patentee has proven to the skilled reader that the invention works, *or how to make it work*, which is an enablement issue." *Centrak*, 915 F.3d at 1365 (citing *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1191 (Fed. Cir. 2014)) (emphasis added).

Importantly, "[a] claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language." *LizardTech, Inc. v. Earth Resource Mapping, Inc*., 424 F.3d 1336, 1345 (Fed. Cir. 2005). The written description requirement does not require the applicant "to describe exactly the subject matter claimed, [instead] the description must clearly allow persons of ordinary skill in the art to recognize that [he or she] invented what is claimed." *Union Oil Co. of California v. Atl. Richfield Co*., 208 F.3d 989, 997 (Fed. Cir. 2000). The level of detail required to satisfy the written description requirement "varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Ariad Pharm*, 598 F.3d at 1351. "[W]hen examining the written description for support for the claimed invention," the Federal

Circuit has held, "the exact terms appearing in the claim 'need not be used in *haec verba*.'" *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1345 (Fed. Cir. 2016). The necessary support may be provided through the "words, structures, figures, diagrams, formulas, etc…" *Id.*

Here, the intrinsic record supports a finding that the inventor was in possession of the invention at the time of the filing of the '247 Patent.

## IV.   ARGUMENT

Zebra's motion for summary judgment for lack of written description is based on two faulty premises: that the specification fails to disclose (1) "a processor that can output a specific signal 'when in communication with an RFID circuit'" and (2) "a processor that can output a 'signal adapted to engage or disengage at least one device.'" Dkt. 54 at 1. To make this assertion, Zebra incorrectly interprets the language of the asserted claims, untethered from the teachings of the specification or the knowledge and experience of one skilled in the art, and then asserts that the specification lacks corresponding written description to support its incorrect interpretations.

> ### A.   The '247 Patent Teaches "a processor wherein…the processor is configured for outputting at least one signal …when in communication with an RFID circuit"

Zebra asserts that the phrase "<u>when</u> in communication with an RFID circuit" should be construed to mean "<u>at the time of</u> communication with an RFID circuit." Dkt. 54 at 9. Zebra interprets the phrase "at the time of" to mean "that the outputting of the adapted signal must happen concurrently with the communication with the RFID circuit" – in other words, *in the same instance of time* or *simultaneously with*. Dkt. 43-15 ¶ 8; Dkt. 54 at 9-10. Ignoring all of the teachings of the specification and without any support, Zebra's expert concludes in a single sentence that "when in communication with" means "at the time of" and that it cannot mean "after" or "if" because some claims use those words in *different* phrases:

> Reading the '247 patent, a POSITA would understand the word "when" in the asserted claims requires that the processor output the adapted signal ***at the time of*** communication with an RFID circuit. As confirmation, the claims use different temporal words such as "after" where they refer to one event happening after another (see, e.g., claim 14:"communicate a signal … after the determination is made"), so a POSITA would not understand the word "when" in the asserted claims to mean "after." And the claims use conditional words such as "if" where they create a condition (see, e.g., claim 12: "processor means operable to determine if a RFID circuit type presently being communicated with is allowed"), so a POSITA would not understand the word "when" in the asserted claims as a conditional word.

Dkt. 54-16 ¶ 33. With its bald interpretation in hand, Zebra and its expert go on to argue that "the specification fails to disclose the 'processor' phrase's temporal requirement." Dkt. 54 at 9. Zebra's assertion fails for at least the following reasons:

> 1. ***Zebra's attempt to reconstrue the processor phrase immediately after conclusion of claim construction should be rejected***

As an initial matter, Zebra had the opportunity to propose the phrase "when in communication with…" for construction during *Markman* but, instead, chose to proceed with its failed argument that the processor phrase is indefinite under Sec. 112 ¶ 6. *See* Dkts. 43, 45, 46. Indeed, Zebra and its expert provided the exact same faulty opinion interpreting the phrase "when in communication with…" during claim construction. *See* Dkt. 43 at 16; Dkt. 43-15 ¶¶ 8, 16. The paragraph cited above from Zebra's expert's declaration in support of its motion for summary judgment is taken almost verbatim from his declaration supporting Zebra's claim construction positions regarding the processor phrase. *Compare* Dkt. 54-16 ¶ 33 *with* Dkt. 43-15 ¶ 8.

The Court considered Zebra's positions and rejected them. Dkt. 52 (*Markman* Order) at 4-6; Dkt. 57 ("The Court hereby **DENIES** Defendant's Motion for Summary Judgment insofar as Defendant argues the asserted claims are invalid as indefinite. The Court considered this argument at the Claim Construction stage and declined to accept it then. It has not since changed its

position."). Zebra's attempt at a second bite of the apple violates the Court's Scheduling Order, is contrary to the proceedings of this Court, and should be denied.

  2. ***Zebra's proposed interpretation of the phrase "when in communication with …" ignores the teachings of the '247 Patent***

  Even if reconsidered, Zebra's misconstrued argument regarding the phrase "when in communication with an RFID circuit" is still unconvincing. To begin, neither Zebra nor its expert have substantiated Zebra's expert's conclusory statements regarding any alleged claim differentiation with legal authority or explained why a cursory recitation of other claimed embodiments trumps the teachings of the specification. *See* Dkt. 54 at 9; Dkt. 54-16 ¶ 33-34. As the Court is well aware, "[a]lthough the doctrine of claim differentiation may at times be controlling, construction of claims is not based solely upon the language of other claims; the doctrine cannot alter a definition that is otherwise clear from the claim language, description, and prosecution history." *O.I. Corp. v. Tekmar Co*., 115 F.3d 1576, 1582 (Fed. Cir. 1997); *see also In re Qualcomm Litig.,* No. 17-CV-00108-GPC-MDD, 2018 WL 1406944, at *21 (S.D. Cal. Mar. 21, 2018) ( "claim differentiation argument is afforded less weight where the 'description provides a clear meaning for the language of the claim in this case' and because such a clear meaning can 'trump[ ] the doctrine of claim differentiation.'") (citing O.*I. Corp*); *Imonex Servs., Inc. v. W H Munzprufer Dietmar Trenner GMBH*, No. CIV.A. 2:01-CV174TJW, 2002 WL 34455164, at *3 (E.D. Tex. Oct. 25, 2002) ("The doctrine of claim differentiation is not a hard and fast rule. If the claim language, read in conjunction with the specification and prosecution history admit only one construction, the court must adopt it."). Claim differentiation simply does not apply here and should be rejected because the teachings of the specification dictate otherwise. At best, Zebra has pointed to the language of the original claims, not the reexamined claims asserted here. As the Federal Circuit has repeatedly found, "this is simply a case where the patentee used different words

to express similar concepts even though it may be confusing drafting practice." *Blue Calypso*, 815 F.3d at 1347 (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,381 F.3d 1111, 1120 (Fed. Cir. 2004)). But using different words to explain the same concept does not negate the teachings of the specification. *See id.*

The specification teaches the RFID base unit communicates with devices through communication channels once the RFID base unit interfaces with the RFID circuit of an RFID tag:

> An RFID base unit is provided that is adapted to communicate with at least a first and a second RFID tag type of a plurality of RFID tag types. An ***RFID tag then interfaces with the RFID base unit***, where the RFID tag is of the first or the second RFID tag types. ***Once the at least one RFID tag interfaces with the RFID base unit***, indicia of engagement, disengagement or other affect [*sic*] on the control or operation is communicated to the external device.

'247 Patent at 3:26-36. Put simply, an RFID base unit comes in proximity with or otherwise engages an RFID tag, which includes an RFID circuit. Rodriguez Dec. ¶¶ 25, 28, 63-68, 75-79. When the tag and the base unit have established communication, which can occur once or over a period of time, the base unit will send a signal to a device that engages, disengages, or effects the control or operation of that device. *Id.*

The specification expands on the teaching it provides in the Summary of the Invention using description of various disclosed embodiments. For example, the specification teaches "[i]n FIG. 3, an alternative security device 334 can communicate with the RFID base unit 304 through the communication channel 336. ***Until conditions*** of both the RFID tag 302 and the alternative security device 334 ***are satisfied***, access to an automated device or to an area is denied." '247 Patent at 5:66-6:3 (emphasis added). With respect to Fig. 4, the specification provides an example of usage of the RFID base unit in an industrial application. *Id.* at 6:17-21. In the first step, an RFID base unit interfaces with an RFID tag, energizing the tag and receiving its identification information (ID). *Id.* at 6:22-25. Depending on whether the ID is correct, access to a device or area

is granted or denied. *Id.* at 6:26-29; *see also id.* at 6:29-45. Allowing access to a device or area requires the RFID base unit to communicate its determination to a device through communication channels such as Bluetooth or USB using a signal. *See, e.g., id.* at 3:26-36; 4:61-5:16; 5:37-50; *see also* Rodriguez Dec. ¶¶ 28-35, 51-61, 77-79. The RFID base unit sends that signal to a network or device once it has established communication with an RFID tag. *Id.*; *see also id.* at 4:24-32; 5:6-13. The base unit performs the functionality of "outputting at least one signal…when in communication with an RFID circuit" using a processor and microcontroller. *Id.* 4:5-12; 4:61-64.

Accordingly, the specification teaches and one skilled in the art understands that the base unit must first interface with an RFID tag ("when in communication with an RFID circuit") and once it has done so it can output a signal to "engage or disengage at least one device..." Rodriguez Dec. ¶¶ 25, 78, 83-86. Zebra's interpretation of the claims defies logic. It implies that the RFID base unit must decide to whether to send an engage or disengage signal to the device *before or at the exact moment* it receives information from the RFID tag on which it will base that very decision. This interpretation renders the claimed invention inoperable and excludes the teachings of the specification, including the preferred embodiment. Such contentions should be rejected. *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1278 (Fed. Cir. 2011) ("a construction that renders the claimed invention inoperable should be viewed with extreme skepticism"); *On-Line Tech.*, 386 F.3d at 1138 (Fed. Cir. 2004) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'").

Zebra does not dispute the above recited teachings of the specification. *See* Dkt. 54 at 9. Instead, Zebra contends that because "when" must mean "at the time of" and thus implies some sort of simultaneous transmission of information between the base unit and the RFID tag and the device, the specification lacks written description. *Id.* However, Zebra's interpretation of the word

"when" rests squarely on a single sentence from its expert and ignores all cannons of claim construction, including the primacy of intrinsic evidence over conclusory expert statements. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).

As Dr. Rodriguez has outlined in detail, the disclosure of the '247 Patent reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the patent's filing date. *See Ariad Pharm*, 598 F.3d. at 1351; *Union Oil*, 208 F.3d at 997. Accordingly, Zebra's motion for summary judgment based on its flawed interpretation of the phrase "when in communication with an RFID circuit" should be denied.

      **B.**    **The '247 Patent Teaches "a processor wherein…the processor is configured for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard…"**

Zebra contends that the phrase "outputting at least one signal adapted to engage or disengage at least one device" lacks written description because "[n]othing in the specification discloses the structure of the adapted signal or how the processor would create the adapted signal." Dkt. 54 at 9-10. However, "written description is about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described; ***it is not about*** whether the patentee has proven to the skilled reader that the invention works, ***or how to make it work***, which is an enablement issue." *Centrak*, 915 F.3d at 1365 (emphasis added). Zebra confuses the standard for written description because, as before, its argument merely recycles its claim construction position that the processor phrase is indefinite for lacking structure. *See* Dkt. 43 at 10-18. The Court rejected that position and should do so again here.

      1.    *Zebra's admissions belie its theory of invalidity*

Zebra and its expert admit the '247 Patent discloses key features of the "at least one signal…" *See* Dkt. 54 at 9-10; Dkt. 54-16 ¶ 37. In Zebra's own words, "the specification discloses

the source of that signal (microcontroller 310 in FIG. 3), the medium through which the signal would be transmitted (connection standards 316, 318, 320, 322, and 324 in FIG. 3) and the destination of that signal (a device on computer network 314 in FIG. 3)." *Id.* Although Zebra and its expert feign ignorance as to a POSITA's ability to ascertain the "structure of the adapted signal itself or how that signal is created" based on the '247 Patent's specification, in the very next section of its motion regarding indefiniteness, Zebra's expert provides a number of examples of the *structure* of the claimed signal and *how* a POSITA would go about creating the claimed signal:

> A POSITA would know that there are multiple possible ways for the processor to carry out the claimed signal step. For example, external device A (e.g., a printing machine) could have an internal logic module that when receiving (e.g., via Bluetooth) the string '11111111' it enables the device and when receiving the string '10011001' it disables the device.
>
> On the other hand, external device B (e.g., a drilling machine) could have an internal activation/deactivation relay that depends on the frequency of received pulses (e.g., also sent via a Bluetooth connection). If the pulse frequency is high (e.g., 100 pulses per second or more) the relay is activated and when the pulse frequency is low (e.g., 10 pulses per second or lower) the relay is deactivated.
>
> Another example, of high security application, is when external device C uses an internal deciphering module (e.g., Public Key Infrastructure or PKI) for its activation/deactivation. Here, the external device accepts an activation/deactivation command only if it verifies the authenticity of the controlling device (i.e., the sender).
>
> In addition to the above examples, there could be other possibilities as well that depend specifically on the design and implementation of the external device. A POSITA also would know that the multitude of possible implementations would further depend on the type of device that was to be "engaged or disengaged." Adapting a signal to "engage or disengage" a device depends on the specific external device.

Dkt. 54-16 ¶ 42 (paragraph breaks added); Dkt. 54 at 12-13.

Without effort or experimentation, Zebra's expert provides examples of three types of signals "adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit" and admits that he could also structure and create others depending on the type of device used in a specific RFID application. *Id.* That the

specifics of the structure of the claimed signal depends on the type of device that must be engaged or disengaged is of no moment. As discussed above, the specification explicitly rejects limiting the inventions of the '247 Patent to a single implementation. *See* '247 Patent at 4:18-24 ("In operation*, there [sic] a number of configurations that can be employed*…."); 6:9-16 ("There are a *large number of combinations* of devices, RFID tags, and communication techniques that can be employed to yield that *flexibility*."); 6:55-63 ("The capabilities outlined herein *allow for the possibility of a variety of programming models*. This disclosure should not be read as preferring *any particular programming model, but is instead directed to the underlying mechanisms on which these programming models can be built*."). *See also* '247 Patent at 4:62-64, 5:22-34.

The very design and nature of the claimed RFID base unit lies in the fact it is equipped with features and mechanisms needed to allow those skilled in the art to program (i.e., configure) the base unit's processor to "allow for dynamic access and updates to tailor the RFID base unit for virtually any situation." '247 Patent at Abstract. The programming know-how of processors was well known in the art and the patentee was not required to repeat them again. *Immunex Corp. v. Sandoz Inc*., 964 F.3d 1049, 1064 (Fed. Cir. 2020) ("It is well-established that a patent specification need not re-describe known prior art concepts."); *see also Zoltek Corp. v. United States*, 815 F.3d 1302, 1308 (Fed. Cir. 2016) ("The written description need not include information that is already known and available to the experienced public."); *see also* Rodriguez Dec. ¶¶ 62-72 (describing several well-known methods for configuring a processor to send a signal to a device and opining on the ubiquitousness of processors at the time of the invention).

"Traditionally, RFID base units were tailored for specific types of tags. The RFID base units have also been tailored for specific applications, and have not been necessarily monitored." *Id.* at 3:15-20. The flexibility of the invention does not create a "problem" as Zebra asserts. *See*

Dkt. 54 at 11. It solves it. So long as "the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date," the '247 Patent has provided sufficient written description. *Ariad Pharm*, 598 F.3d. at 1351. As Zebra and its expert have admitted, the disclosure has done just that.

## 2.   *The '247 Patent discloses the claimed adapted signal*

The Summary of the Invention provides, "Once the at least one RFID tag interfaces with the RFID base unit, indicia of engagement, disengagement or other affect [*sic*] on the control or operation is communicated to the external device." '247 Patent at 3:33-36. As discussed above, the "indicia of engagement" is described as the transmission of a signal. *See, e.g.*, *id.* at 5:43-65; Rodriguez Dec. ¶¶ 24, 28. For example, the specification teaches that the claimed RFID base unit can send and receive "*digital and/or relay signals*" in order to "enable or disable access to the automated device 330" shown in Fig. 3. '247 Patent at 5:37-50. In another example, the specification teaches that "the RFID base unit 304 could be employed *to signal a controller* if the proper operator is not present and/or in an acceptable location to operate a device." *Id.* at 5:60-65. That the asserted claims do not recite phrases relating to the signal verbatim from the specification does not negate the sufficiency of the specification's disclosure supporting those claims. *See Blue Calypso*, 815 F.3d at 1345 ("when examining the written description for support for the claimed invention, the exact terms appearing in the claim 'need not be used in *haec verba*.'").

Additionally, in reference to Fig. 4, the specification provides an algorithm that teaches the steps necessary for a processor to perform in an exemplary application, including sending a signal to grant or deny access to a device or area. '247 Patent at 6:17-45; Rodriguez Dec. ¶¶ 29-3180-86. Zebra asserts that Fig. 4 does not teach an algorithm. Dkt. 54 at 3, 8. However, an algorithm may be shown in the form of a flowchart like the one shown in Fig. 4, which includes an accompanying detailed description in the specification. *See Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312

(Fed. Cir. 2012); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008). Importantly, however, an algorithm is ***not*** required to show that the specification provides the requisite written description. *See Ariad Pharm*, 598 F.3d. at 1351 (describing the test for written description as "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."). Zebra's contention that an algorithm is necessary to meet this test is yet another attempt at a redo of its failed indefiniteness arguments for the processor phrase. *See* Dkt. 43 at 1-2; 7-8; 15-18 (and arguing that an algorithm is required to show sufficient structure under Sec. 112 ¶ 6). The Court rejected that argument during claim construction and should do so again here.

3.  ***Zebra's comparison of the originally submitted claims is deceptive and misleading***

Zebra asserts that the patent's original disclosure did not teach the signal phrase because the phrase was added during prosecution. Dkt. 54 at 10. To support this contention, Zebra makes a comparison between originally submitted Claim 1 and reexamined Claim 48. *Id.* at 10-11. However, original Claim 1 is ***not*** the claim that issued as Claim 9, which was later incorporated into the reexamined claims. It was original Claim 31 that the patentee amended for clarity and that was renumbered and issued as Claim 9. Original and amended Claim 31 follow:

> 31. An apparatus comprising an RFID base unit at least configured to employ two or more connection standards of a plurality of connection standards and that is configured to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit.

Ex. 9 (2005/01/20 Original Claims) at 23.

31. (currently amended) An apparatus comprising an RFID base unit incorporating a processor wherein the base unit is at least configured to employ two or more connection standards of a plurality of connection standards and that said processor is configured to for outputting at least one signal adapted to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit.

Ex. 3 (2007/02/09 Claim Amd) at 4-5. Contrary to Zebra's assertion, the "processor phrase" was not a wholesale addition to the original claims. *See* Dkt. 54 at 5, 10-11; *see also* Ex. 4 (2007/02/09 Response to Office Action) at 8. As shown above, the original claims always required that the RFID base unit be "configured to engage or disengage at least one device through at least one connection standard when in communication with an RFID circuit." As known to one skilled in the art, the primary way to do so would be to "adapt a signal" to carry out functions the specification expressly states are performed by a processor. *See* '247 Patent at 4:7-12; Rodriguez Dec. ¶¶ 50-74. The patentee's use of slightly different terms to provide the same meaning does not amount to lack of written disclosure. *See, e.g.*, *Blue Calypso*, 815 F.3d at 1345; *Union Oil*, 208 F.3d at 997; *cf. In re Anderson,* 471 F.2d 1237, 176 USPQ 331 (CCPA 1973) (finding new matter does not exist when rephrasing language from the specification).

## V.      CONCLUSION

Zebra has failed to meet its high burden of proving with clear and convincing evidence that the '247 Patent is invalid for lack of written description. As detailed above and as provided by Intellectual Tech's expert, the disclosure of the '247 Patent "conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *See Ariad Pharm*, 598 F.3d. at 1351. Intellectual Tech has shown that there is at least a genuine issue of material fact regarding the written description of the '247 Patent. Given that all of Intellectual Tech's evidence as the non-movant is to be believed and all justified inferences drawn in its favor, the Court should deny Zebra's motion for summary judgment.

Dated: November 19, 2020

Respectfully submitted,

*/s/ Niky R. Bagley*

Gary R. Sorden
Texas Bar No. 24066124
gsorden@coleschotz.com
Aaron Davidson
Texas Bar No. 24007080
adavidson@coleschotz.com
Niky R. Bagley (admitted via *pro hac vice*)
Texas Bar No. 24078287
nbagley@coleschotz.com
Brian L. King
Texas Bar No. 24055776
bking@coleschotz.com
James R. Perkins
Texas Bar No. 24074881
perkins@coleschotz.com

COLE SCHOTZ, P.C.
901 Main Street, Suite 4120
Dallas, Texas 75202
Tel: (469) 557-9390
Fax: (469) 533-1587

**ATTORNEYS FOR PLAINTIFF
INTELLECTUAL TECH LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2020, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Western District of Texas, Waco Division, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/Niky R. Bagley*
Niky R. Bagley