IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| **INTELLECTUAL TECH LLC,**<br>Plaintiff,<br><br>v.<br><br>**ZEBRA TECHNOLOGIES CORPORATION,**<br>Defendant. | 6:19-cv-00628-ADA |

**MEMORANDUM OPINION & ORDER GRANTING-IN-PART-AS-MODIFIED AND DENYING-IN-PART DEFENDANT ZEBRA'S MOTION FOR SUMMARY JUDGMENT FOR LACK OF STANDING [ECF No. 116]**

Came on for consideration this date is Defendant Zebra Technologies Corporation's Motion for Summary Judgment for Lack of Standing Pursuant to Federal Rules of Civil Procedure 56. ECF No. 116 (the "Motion"). Plaintiff Intellectual Tech LLC ("IT") filed an opposition on March 3, 2022, ECF No. 123, to which Zebra replied on March 17, 2022, ECF No. 124. The Court heard oral arguments on the Motion on May 2, 2022. *See* ECF No. 141. That same day, the Court ordered this Action stayed pending resolution of the Motion. ECF No. 142. After careful consideration of the Motion, the Parties' briefs, and the applicable law, the Court **GRANTS-IN-PART-AS-MODIFIED AND DENIES-AS-MOOT-IN-PART** Zebra's Motion for Summary Judgment for Lack of Standing Pursuant to Federal Rules of Civil Procedure 56. ECF No. 116.

**I. BACKGROUND**

Whether IT suffered a constitutional injury depends on a series of interrelated agreements that IT entered into with its parent, OnAsset Intelligence, Inc. ("OnAsset"), and OnAsset's creditor, Main Street Capital Corporation ("Main Street"). OnAsset gave Main Street a security interest in U.S. Patent No. 7,233,247 (the "'247 patent") in exchange for a loan. And when OnAsset defaulted on that loan, Main Street gained certain rights in the '247 patent by dint of its security

1

interest. OnAsset and Main Street later entered a forbearance agreement to deal with on OnAsset's default. IT sprung from that forbearance and was given, along with title to the '247 patent, a mandate to monetize the '247 patent. In furtherance of that mandate, IT sued Zebra in this Court on October 22, 2019, alleging infringement of the '247 patent. *See* ECF No. 1. But the rights Main Street maintained in the '247 patent—through security interests followed by defaults—cast a cloud over IT's constitutional.

## II. LEGAL STANDARD

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650, 198 L. Ed. 2d 64 (2017). To have standing, IT "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016). "Th[at] triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement," and IT, as "the party invoking federal jurisdiction[,] bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) (footnote omitted).

Regional circuit law governs standards for the "dismissal of a complaint for lack of standing unless the issue is unique to patent law and therefore exclusively assigned to the Federal Circuit." *Univ. of S. Fla. Rsch. Found., Inc. v. Fujifilm Med. Sys. U.S.A.*, 19 F.4th 1315, 1323 (U.S. Fed. Cir. 2021). Federal Circuit law governs an entity's constitutional standing in a patent infringement action. *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1263 (Fed. Cir. 2010).

"[E]ach element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, with the same evidentiary requirements of

that stage of litigation." *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 366 (5th Cir.), *as revised* (Feb. 1, 2018), *cert. denied*, 139 S. Ct. 211, 202 L. Ed. 2d 126 (2018) (quotation marks omitted). Thus, at summary judgment, IT cannot rely on "mere allegations"; it "must set forth by affidavit or other evidence specific facts" supporting standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (quotation marks omitted).

### III. ANALYSIS

#### A. Summary Judgment, Reconsideration, and Subject Matter Jurisdiction

IT asserts that this Court should deny Zebra's Motion on procedural grounds because this Court already disposed of this issue at the dismissal stage. ECF No. 123 at 1. On January 19, 2021, Zebra filed a motion to dismiss for lack of constitutional and statutory standing. ECF No. 68. That motion became ripe on January 29, 2021, ECF No. 74 (the "Dismissal Motion"), and the Court entered a brief order holding that "Intellectual Tech LLC is the rightful owner of the '247 patent, retains the right to enforce that patent, and thus has constitutional and statutory standing to bring a patent infringement suit against Zebra Technologies Corporation," ECF No. 75. IT contends that, "under Federal Rule of Civil Procedure 12(d), Zebra's Motion to Dismiss must be treated as a motion for summary judgment under Rule 56," supposedly because Zebra's motion to dismiss "presented matters outside the pleadings, including certain loan, security, and forbearance agreements." ECF No. 123.

This Court need not treat Zebra's Dismissal Motion as a motion for summary judgment because courts in the Fifth Circuit are permitted to resolve factual disputes underlying subject matter jurisdiction without converting a motion under Rule 12(b)(1) to one for summary judgment. *See, e.g.*, *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) ("In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute."). And in any event, the Court has authority under Rule 54(b) to "to revise[] at any time

3

any order or other decision . . . [that] does not end the action." *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (quoting Fed. R. Civ. P. 54(b)) (internal quotation omitted, alterations in original). Federal Rule of Civil Procedure 54(b) "reflect[s] the inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires." *Id.* (internal quotation omitted). In accordance with this Rule, courts may reconsider and reverse prior decisions "even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Id.* Accordingly, the Court exercises its discretion to reconsider any prior judgment as to IT's rights in the '247 patent as it bears on constitutional standing.

Moreover, as to the instant Motion, the Fifth Circuit has "expressed doubt as to the propriety of summary judgment as a tool for disposing of a case on jurisdictional grounds when the district court does not actually purport to address the merits of the parties' dispute." *Gaspard v. Amerada Hess Corp.*, 13 F.3d 165, 168 (5th Cir. 1994). The Federal Circuit has likewise treated a summary judgment motion for lack of subject matter jurisdiction as a "suggestion" that the district court should dismiss under Rule 12(b)(1). *See Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 883–84 (Fed. Cir. 1985); *see also* Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 & n.33 (3d ed.) (collecting cases). The Court, therefore, treats this Motion as a renewed motion to dismiss under Rule 12(b)(1).

    **B.**    **Constitutional Standing**

        1.    <u>Main Street's Rights</u>

As explained in more depth below, the Court's constitutional-standing inquiry focuses on whether IT had an exclusionary right when it filed suit against Zebra. To ascertain the scope of IT's rights, the Court must consider what rights IT ceded to its creditor, Main Street, if any.

        a.        Structure of the Parties' Agreements

On April 2, 2011, OnAsset, Plaintiff IT's parent company, entered into a "2011 Loan Agreement" with a lender, Main Street.[1] ECF No. 116 at 2. As a condition of the 2011 Loan Agreement, OnAsset granted a security interest in all of its property, including the '247 patent. ECF No. 116 at 2. According to the "2011 Patent and Trademark Security Agreement" between OnAsset and Main Street, if OnAsset defaulted on the 2011 Loan Agreement, Main Street could, "at its option," "sell, assign, transfer, pledge, encumber or otherwise dispose" of the '247 patent. ECF No. 62-2 at Section 6. But only so long as OnAsset was in default. *Id.* ("While a Default exists . . . .").

The 2011 Patent and Trademark Security Agreement also "irrevocably" appointed Main Street as OnAsset's "attorney-in-fact," with "the right (but not the duty)" to execute any agreement in OnAsset's name necessary for Main Street to enforce, license, sell, assign, transfer, pledge, encumber, or otherwise transfer title in the '247 patent. *Id.* at Section 3(j). Main Street could only exercise this power of attorney while OnAsset was in default and only "[t]o facilitate [Main Street's] . . . exercising" the rights Main Street accrued while OnAsset was in default of the 2011 Loan Agreement. *Id.*

On April 19, 2013, Main Street issued a notice of default to OnAsset. *See* ECF No. 116 at 3. There is no dispute that OnAsset defaulted. *See id.* On June 2, 2017, OnAsset and Main Street entered into a "2017 Forbearance Agreement," which required that OnAsset engage in "Monetization Actions" with respect to the '247 patent. *See* ECF No. 116 at 3–4. To that end, OnAsset formed its subsidiary, Plaintiff IT. *See* ECF No. 116 at 4. Also on June 2, 2017, OnAsset

---

[1] It is this Court's understanding that Texas law governs the relevant agreements referred to herein. *See also* ECF No. 123 at 8 n.5.

5

and IT entered into a Contribution Agreement that assigned the '247 patent to IT. *See* ECF No. 116 at 4; ECF No. 123 at 3.

At the same time, IT and Main Street executed: a 2017 Joint Agreement binding IT to the 2011 Loan Agreement as a borrower, *see* ECF No. 116 at 4 n.3; and a "2017 Patent and Trademark Security Agreement" that mirrored the terms in the 2011 Patent and Trademark Security Agreement, ECF No. 62-8; *see* ECF No. 116 at 4 n.3. But by December 2018, IT had defaulted on several obligations under the 2017 Forbearance Agreement and 2011 Loan Agreement. *See* ECF No. 116 at 5. Nevertheless, IT initiated this action in October 2019. ECF No. 1. Almost two years later, in the summer of 2021, IT and Main Street entered into a First Amended Forbearance Agreement. *See* ECF No. 116 at 5.

          b.        Effect of Default

Zebra alleges that OnAsset's 2013 default divested OnAsset of its rights in the '247 patent, making the 2017 assignment to IT ineffective. This Court disagrees. By its terms, the 2011 Patent and Trademark Security Agreement undoubtedly granted Main Street the right, on OnAsset's default, to enforce, "sell, assign, transfer, pledge, encumber or otherwise dispose of" the '247 patent. ECF No. 62-2 at Section 6. It did not, however, automatically divest OnAsset of title to the '247 patent. Texas law provides that, after default, a secured party "may take possession of the collateral," not that the debtor is automatically divested of title to the collateral. Tex. Bus. & Com. Code § 9.609(a)(1). Moreover, many of the secured party's rights after a default will be dictated "by agreement of the parties." *Id.* § 9.601(a), and no agreement herein provided for automatic divestment.

Main Street had the right to take title to (that is, foreclose upon) the '247 patent so long as OnAsset was in default, but there is no indication Main Street exercised that option. Accordingly,

the 2017 assignment of the '247 patent from OnAsset to IT was proper and there is no defect in the chain of title. IT's rights in the '247 patent were, however, subject to Main Street's rights under Section 6 of the 2011 Patent and Trademark Security Agreement. *See* ECF No. 62-2 at Section 7 ("This Agreement shall be binding upon and inure to the benefit of Debtor and Secured Party and their respective participants, successors and assigns . . . ."). And Main Street's rights under that section would only revert to IT if, for example, Main Street waived them or OnAsset cured its default of the 2011 Loan Agreement.

The Court holds that the 2017 Forbearance Agreement did not act to revert Main Street's rights in the '247 patent to IT. Rather, the terms of the 2017 Forbearance Agreement unequivocally provide that Main Street was merely forbearing "any exercise and enforcement of such rights." ECF No. 68-2 at IT001670, 1672 (Section 4(a)), 1679 (Section 9), 1682–83 (Section 17). Moreover, the Court is satisfied that IT's December 2018 default on the 2017 Forbearance Agreement relieved Main Street of its duty to forbear exercising its rights to the '247 patent.[2] *See* ECF No. 68-2 at IT001627 (Section 4(a)).

As such, when IT initiated this Action on October 22, 2019, Main Street possessed rights to enforce, "sell, assign, transfer, pledge, encumber or otherwise dispose of" the '247 patent. Main Street's possession of those rights was uninterrupted from at least April 19, 2013, when it issued its notice of default to OnAsset. From June 2, 2017 (the effective date of the 2017 Forbearance Agreement) to December 2018 (when IT defaulted on the 2017 Forbearance Agreement and 2011 Loan Agreement), Main Street was bound to forbear exercising its rights in the '247 patent.

---

[2] Even if it could be argued that the 2017 Forbearance Agreement reverted Main Street's rights in the '247 patent to IT, IT's 2018 default provided an identical set of rights to Main Street according to Section 6 of the 2017 Patent and Trademark Security Agreement. ECF No. 62-8 at Section 6.

IT's opposition to Zebra's Motion is not inconsistent with this description of the distribution of rights among IT, Main Street, and OnAsset. IT primarily objected to Zebra's theory that title in the '247 patent automatically transferred to Main Street on default. ECF No. 123 at 6–9. This Court rejects Zebra's "automatic transfer theory"—or at least IT's articulation of that theory—for those reasons stated above (and those IT identified). ECF No. 123 at 7. As explained above, while title to the '247 patent did not pass automatically, other rights in the '247 patent did. And Zebra correctly notes how IT's opposition "misses the mark." ECF No. 124 at 1. "The issue not whether *ownership* of the '247 patent transferred upon default, but rather whether the rights that Main Street received deprive IT of its . . . ability to exclude others from using the [patented] invention." *Id.* As discussed below, the Court holds that the rights Main Street received deprived IT of those exclusionary rights critical to constitutional standing.

2. Constitutional Standing Demands an Exclusionary Right

Ascertaining standing in a patent-infringement case requires an inquiry into both Article III or "constitutional" standing and what has been called "statutory" or "prudential" standing. To have constitutional standing, a plaintiff must have an "exclusionary right." *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340 (Fed. Cir. 2007). To have statutory standing, a plaintiff must have "all substantial rights" to the asserted patent. *Id.*

As other courts have more coherently explained, "constitutional standing in a patent case is anything but straightforward." *Uniloc USA, Inc. v. Motorola Mobility, LLC*, No. CV 17-1658-CFC, 2020 WL 7771219, at *3 (D. Del. Dec. 30, 2020) (hereinafter, *Motorola*). The Supreme Court has confirmed that patent owners and even exclusive licensees have constitutional standing to sue for patent infringement. *See Indep. Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 469, 472 (1926). As the decades have rolled by, however, it has become increasingly unclear who qualifies as a "patent owner" or an "exclusive license"—or whether these labels are helpful in

discerning who suffers a constitutional injury by another's infringement. *See id.* (collecting cases). In *WiAV Solutions LLC v. Motorola, Inc.*, the Federal Circuit attempted to bring desperately needed clarity. 631 F.3d at 1265. It determined that an exclusive licensee has no constitutional standing to sue a defendant who holds a license or can obtain one. That is, it has no "exclusionary right" against such a defendant. *See generally id.*

      a.  The *WiAV* Opinion

The *WiAV* opinion laid out in clear terms how courts should evaluate the constitutional standing of those alleging to be exclusive licensees. The panel clarified two strains of its precedent: cases involving an agreement explicitly deeming the plaintiff an "exclusive licensee," like the case before the *WiAV* court; and cases involving agreements of lesser clarity as to the nature of the granted license. Authority in the latter category endorsed a searching inquiry to determine whether the patentee intended for the plaintiff to be its exclusive licensee. *Id.* at 1264–65; *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1485 (Fed. Cir. 1998) (holding that a requirements contract for the accused product did not convert the exclusive supplier into an "exclusive licensee" because the licensor did not promise that all others would be excluded from practicing the patented invention); *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1368 (Fed. Cir. 2008) (holding that a licensee was not an "exclusive licensee" because others were permitted to practice the invention in the relevant territory).

Once a court determines that the parties to the relevant agreement intended for the plaintiff to be an exclusive licensee—in *WiAV*, the relevant agreement explicitly labeled the plaintiff as such—it will be presumed that the plaintiff has constitutional standing to sue any entity *not* falling into one of the following two buckets. *WiAV*, 631 F.3d at 1267. In the first bucket are non-exclusive licensees in existence at the time plaintiff received the exclusive license. *Id.*; *see also Alfred E.*

*Mann Found. For Scientific Research v. Cochlear Corp.*, 604 F.3d 1354 (Fed. Cir. 2010) (concluding that a licensee was an exclusive licensee of a patent despite the licensor retaining the ability to license the patent to settle lawsuits). The second bucket holds any entity that could obtain a license. For example, a defendant could obtain a license from a member of the first bucket that possesses a right to sublicense the defendant. *WiAV*, 631 F.3d at 1267. "[I]f an exclusive licensee has the right to exclude others from practicing a patent, and a party accused of infringement does not possess, and is incapable of obtaining, a license of those rights from any other party, the exclusive licensee's exclusionary right is violated." *Id.* at 1266–67.

The *WiAV* panel concluded that its plaintiff had constitutional standing to sue the named defendants because the rights of certain third parties to sublicense the asserted patents were so cabined that the named defendants could not obtain a license on the accused technology. This Court, like others, reads *WiAV* to mean that an "exclusive licensee" lacks constitutional standing to sue *anyone* if a third party has an unconditional right to license the asserted patent to *everyone*. *See Motorola*, 2020 WL 7771219, at *4 ("[U]nder *WiAV*, a third party's legal right to grant the defendant a license to the asserted patent deprives an exclusive licensee plaintiff of standing." (citing *ChromaDex, Inc. v. Elysium Health, Inc.*, 507 F. Supp. 3d 579, 585 (D. Del. 2020))).

Two district courts—the District of Delaware and the Northern District of California—recently extended *WiAV* to hold that even a patent owner lacks constitutional standing if a third party has an unfettered right to sublicense the asserted patent. The Court considers those two opinions in turn and joins them in extending *WiAV*.

          b.      The *Uniloc* Cases

In *Motorola*, the U.S. District Court for the District of Delaware held that plaintiffs, Uniloc Luxembourg, S.A. and Uniloc USA, Inc. (collectively, the "Unilocs"), lacked constitutional

standing to sue for patent infringement where the Unilocs defaulted on a loan from Fortress Credit Co. LLC ("Fortress"), causing Fortress to automatically accrue a right to sublicense the asserted patents. 2020 WL 7771219, at *8. Years earlier, in late 2014, the Unilocs granted Fortress a license, with a right to sublicense, on the Unilocs' patent portfolio in exchange for a $26 million loan with which the Unilocs meant to fund campaigns to monetize their portfolio. *Id.* at *1. The license agreement specified that Fortress could not to "use" the license and right to sublicense unless and until the Unilocs defaulted on the loan. *Id.* The *Motorola* court described the structure of this license as a "security" on the loan. *Id.*

In March 2017, the Unilocs failed to meet a required monetization goal under the loan agreement; though Fortress "did not view or treat" the Unilocs as having defaulted, the *Motorola* court deemed the derogation a default. *Id.* at *7. Moreover, the default "was neither cured by the Unilocs nor waived by Fortress." *Id.* Upon default, Fortress was, in the court's judgment, free to use its right to sublicense the asserted patent. *Id.* at *8. Fortress held that right as of November 2017, when the Unilocs initiated a patent infringement suit against Motorola. *Id.*

The *Motorola* court opined that the existence of Fortress's unfettered right to sublicense at the time the Unilocs sued Motorola defeated the Unilocs' constitutional standing. *Id.* In holding so, the court read *WiAV* as dictating that "a third party's legal right to license the asserted patent to the defendant deprives the patent's owner . . . of standing to sue for infringement." *Id.* at *4. From this and other precedent, the *Motorola* court distilled a guiding principle: "it is the violation of the exclusionary rights that come with a patent that constitutes the injury-in-fact necessary for Article III standing in a patent infringement case." *Id.* at *5. Reasoning that a plaintiff has no exclusionary right "if another party has the right to allow the defendant to use the patent," the court held that the Unilocs abandoned their exclusionary rights by defaulting on their loan agreement

11

with Fortress and thereby ceding to Fortress the unfettered ability to sublicense.[3] *Id.* Accordingly, the Unilocs did not have constitutional standing to sue Motorola for patent infringement. *Id.*

The U.S. District Court for the Northern District of California considered the same facts only weeks before (though with a different defendant) and reached the same result under the same rationale. *Uniloc USA, Inc. v. Apple, Inc.*, No. C 18-00358 WHA, 2020 WL 7122617, at *7–8 (N.D. Cal. Dec. 4, 2020) (hereinafter, *Apple*) ("A patent licensee's right to grant an unencumbered sublicense renders even the *patent owner's* right to exclude (and, thus, to sue) illusory.").

### 3. IT Lacked an Exclusionary Right

The Court holds that Main Street's rights deprived IT of an exclusionary right at the time IT filed this Action. Zebra relies on *WiAV*, and the *Uniloc* opinions' extension of *WiAV*, to argue that IT has no exclusionary right because Zebra could obtain a license on the asserted patent from Main Street. The Court agrees. On October 22, 2019, Main Street possessed an unfettered right to license the '247 patent.[4] *See supra* Section III.B.1.b. Meaning Zebra had the "ability to obtain" a

---

[3] The *Motorola* court noted a divide in pre-*WiAV* Federal Circuit opinions. In one corner, the court held that a patentee had standing even where a third party had a right to sublicense. *See Alfred E. Mann*, 604 F.3d at 1362; *Aspex Eyewear, Inc. v. Miracle Options, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006). Yet in another case, the court held that a third party's right to sublicense deprived a patentee of standing. *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014), *vacated on other grounds*, 575 U.S. 959 (2015). The latter opinion is consistent with the *WiAV* opinion's robust analysis of the issue. Accordingly, this Court will follow the opinion in *Azure*, as extended in *WiAV*.

[4] It could be argued that Main Street did not possess a right to license the '247 patent because Section 6 of the 2011 Patent and Trademark Security Agreement does not explicitly provide for a right to license, even though Section 3(j) grants a power of attorney to license in support of Section 6. Section 6 did, however, expressly provide a right to assign: the '247 patent; and the right to sue for "past infringement" of the '247 patent. *See* ECF No. 62-2 at Section 6 (granting rights to "Patents"), Section 1 ("Patents" defined to include "right to sue for past infringement and damages). Accordingly, Zebra could have obtained title to the '247 patent from Main Street, effectively licensing all of Zebra's past and ongoing accused conduct, thereby depriving IT of constitutional standing just as if Main Street had an unconditional right to license.

license to the '247 patent from Main Street. *WiAV*, 631 F.3d at 1266. At the very least, IT has not provided contrary evidence regarding Zebra's ability to obtain a license from Main Street. *Cf. Semcon IP Inc. v. Huawei Device USA Inc.*, No. 216CV00437JRGRSP, 2017 WL 1017424, at *3 (E.D. Tex. Feb. 21, 2017) (declining to dismiss a case for lack of constitutional standing where plaintiff provided evidence that relevant third parties did not have the "ability to grant any defendant a license"), *R&R adopted*, No. 2:16-CV-437-JRG-RSP, 2017 WL 1001286 (E.D. Tex. Mar. 15, 2017). Because Zebra had that ability, IT could not have an exclusionary right against Zebra sufficient to engender Article III standing here.

At oral arguments, IT attempted to distinguish *Motorola* and *Apple* by noting that neither dealt with a security agreement. IT also argued that even if Main Street had rights under Section 6, it could only exert those rights "on behalf of Intellectual Tech, not as Main Street." The Court cannot figure how these distinctions are material; neither speaks to a constraint on Main Street's ability to license Zebra's conduct. Accordingly, the Court follows the *Uniloc* opinions, and their extension of *WiAV*, to find a lack of constitutional standing.

IT "must show Article III standing both at the time of the filing of the complaint and throughout the lawsuit." *Brackeen v. Haaland*, 994 F.3d 249, 438 (5th Cir. 2021); *Lujan*, 504 U.S. at 569–70 & n.4 (standing "is to be assessed under the facts existing when the complaint is filed."); *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1077 (Fed. Cir. 2020) (Reyna, J. dissenting) ("A plaintiff must have Article III standing at the time it filed suit."). For the foregoing reasons, IT failed to show Article III standing at the time of the filing of its complaint.

### 4. IT Cannot Retroactively Cure Defects in Constitutional Standing

IT requests that it be afforded the opportunity to cure any defects in constitutional standing by joining Main Street or substituting it under Federal Rules of Civil Procedure 19 or 20. But it is well established that a defect in Article III standing "cannot be cured by the addition of a party

13

with standing, nor by the subsequent purchase of an interest in the patent in suit." *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 (Fed. Cir. 2005); *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010); *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed. Cir. 1998). Accordingly, the Court determines that this Action cannot proceed in view of an incurable standing defect.

### C.  Prudential Standing

Given its holding as to constitutional standing, the Court need not address Zebra's prudential standing challenge.

### IV. CONCLUSION

It is therefore **ORDERED** that Zebra's Motion for Summary Judgment for Lack of Standing Pursuant to Federal Rules of Civil Procedure 56, ECF No. 116, is **GRANTED-IN-PART-AS-MODIFIED AND DENIED-AS-MOOT-IN-PART**.

**IT IS ORDERED** that Zebra's Motion, ECF No. 116, is **GRANTED** to the extent it requests dismissal under Federal Rule of Civil Procedure 12(h)(3) and/or 12(b)(1) of IT's claims for lack of subject matter jurisdiction due to IT's lack of constitutional standing. **IT IS THEREFORE ORDERED** that all of IT's claims against Zebra are hereby **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Zebra's Motion, ECF No. 116, is **DENIED-AS-MOOT** as to Zebra's challenge to IT's statutory standing.

The Clerk of the Court is directed to **CLOSE** the above-captioned matter.

SIGNED this 20th day of May, 2022.

_____
ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE